[No. S104157. July 3, 2003.]

MOHAMMED A. HAMEID, Plaintiff and Appellant, v.
NATIONAL FIRE INSURANCE OF HARTFORD, Defendant and
Respondent.

**COUNSEL**

Daniel S. Klein; Law Offices of Barnard F. Klein and Barnard F. Klein for Plaintiff and Appellant.

Homampour & Associates and Arash Homampour for Coast to Coast Computer Products as Amicus Curiae on behalf of Plaintiff and Appellant.

Gauntlett & Associates, David A. Gauntlett and Eric R. Little for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

Hawkins, Schnabel, Lindahl & Beck, Lindahl, Schnabel, Kardassakis & Beck, Jon Kardassakis, Jeffrey D. Wolfe and Kurt G. Gresenz for Defendant and Respondent.

Nielsen, Haley & Abbott, James C. Nielsen and Jennifer S. Cohn for United National Group as Amicus Curiae on behalf of Defendant and Respondent.

Wiley Rein & Fielding, Laura A. Foggan, John C. Yang, Thomas S. Garrett; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott and J. Karren Baker for the Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Defendant and Respondent.

Law Offices of Michael A. Mathews and Michael A. Mathews for National Association of Independent Insurers and Lumbermens Mutual Casualty Company as Amici Curiae on behalf of Defendant and Respondent.

Horvitz & Levy, Frederic D. Cohen and Peter Abrahams for American International Companies as Amicus Curiae on behalf of Defendant and Respondent.

Selman•Breitman, Neil H. Selman, Jan L. Pocaterra and Lynette Klawon for Scottsdale Insurance Company as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**CHIN, J.**—We granted review to determine a limited issue: When a plaintiff alleges in an underlying complaint that an insured defendant took a competitor's customer list and solicited customers from it, was the defendant's act a misappropriation of advertising ideas that gave rise to the insurer's duty to defend defendant under the "advertising injury" provision of the commercial general liability (CGL) insurance policy? (On May 15, 2002, we filed the order specifically limiting the issue on review to coverage under the advertising injury provision.) We conclude the term "advertising injury" as used in the CGL policy requires widespread promotion to the public such that one-on-one solicitation of a few customers does not give rise to the insurer's duty to defend the underlying lawsuit. For this reason, we reverse the Court of Appeal judgment, which concluded the allegations satisfied the "advertising injury" provision of the CGL insurance policy.

## FACTS

In November 1998, plaintiff Mohammed A. Hameid opened Salon T'Shea, a beauty parlor. Hameid purchased a "Business Account Package Policy" from National Fire Insurance of Hartford (National). The policy was effective from November 2, 1998, to November 2, 2001, and provided CGL insurance, including coverage for "advertising injury" arising out of the "misappropriation of advertising ideas or style of doing business." Salon T'Shea was located near a competitor, Bellezza Salon/Day Spa (Bellezza). Shortly after Salon T'Shea opened, Doreen Howard and Heather Billington, two Bellezza hairdressers, left Bellezza to rent work stations from Hameid, taking most of their customers with them.

In March 1999, KWP, Inc. (KWP), Bellezza's owner, sued Hameid, Howard, and Billington for (1) misappropriation of trade secrets, (2) unfair competition, (3) breach of contract, (4) breach of the implied covenant of good faith and fair dealing, (5) intentional interference with prospective economic advantage, (6) negligent interference with prospective economic advantage, (7) civil conspiracy, and (8) injunctive relief. KWP claimed that

all three defendants possessed "trade secrets," including Bellezza's "customer list, price list and pricing policies," and that the defendants had "misappropriated the above-described trade secrets by committing certain acts, including, but not limited to: utilizing the customer list in order to identify and solicit [Bellezza's] customers, and using [Bellezza's] confidential price list and pricing policies to undercut [Bellezza]." As to Hameid specifically, the KWP action alleged direct misappropriation and unfair competition, conspiratorial activity with the codefendants, and an agency relationship with them.

Hameid's own declaration established that he did no advertising, except to include a flyer in a ValPak that was sent in a mass mailing to local residents. Hameid declares: "Defendants Doreen Howard and Heather Billington rent space at Salon T'Shea which has done no advertising or soliciting for them. What Salon T'Shea does for advertising is to include a flyer in ValPak which is sent to local residents." KWP, however, did not sue Hameid for mailing the ValPak flyer. Instead, KWP sued Hameid for stealing its customer list and soliciting its customers. Even the coupon on the flyer was not applicable to Howard's or Billington's services; it was restricted to other stylists: "20 percent Off Any Service. With Coupon Only. New Clients Only. Discount With Meno or Heidi Only."[1]

Hameid tendered defense of the KWP action to National under the CGL insurance policy's "advertising injury" coverage provision, but the insurer refused to defend him. Hameid prevailed against KWP at trial. He then timely filed the present bad faith action against National for breach of contract and breach of the implied covenant of good faith and fair dealing, seeking to recover defense expenses and punitive damages. The trial court struck the punitive damages claim. It also granted National's motion for summary judgment on the ground that as a matter of law National owed Hameid no duty to defend under the relevant policy provision because the underlying lawsuit claimed misappropriation of trade secrets, and not advertising injury.

The Court of Appeal reversed the judgment, concluding National owed Hameid a duty to defend. The court relied on New Hampshire Ins. Co. v. Foxfire Inc. (N.D.Cal. 1993) 820 F.Supp. 489, 494 (Foxfire), in holding that when we view Hameid's business as a "start-up community beauty salon," the relatively limited solicitation of customers through phone calls and ValPak mailers served to call public attention to the salon' beauty services.

---

[1] Although a separate Penny Saver advertisement is mentioned in investigators' declarations that accompanied KWP's complaint, KWP did not claim the advertisement was wrongful or seek damages based on it, and Hameid did not mention it in any of the initial correspondence between him and National following his tender of defense. In addition, the Penny Saver advertisement was not made a part of the record. We therefore refer to the ValPak advertisement only, because it was included in the record.

The Court of Appeal concluded that solicitation was therefore equivalent to the widespread promotional activities that *Foxfire* found constituted advertising under the CGL insurance policy. (See also *Sentex Systems, Inc. v. Hartford Acc. & Indem. Co.* (N.D.Cal. 1995) 882 F.Supp. 930, 939, affd. (9th Cir. 1996) 93 F.3d 578 [advertising encompasses one-on-one and group solicitations].) Having concluded the insured's conduct fell within the National policy's definition of advertising activity, the court considered whether the policy covered that conduct in its coverage of "advertising injury" arising out of the "misappropriation of advertising ideas or style of doing business." The court concluded that business marketing includes a variety of direct and indirect advertising activities, including misappropriating confidential customer lists to identify and solicit clients. We granted review.

## DISCUSSION

### 1. *General Principles*

Insurance policy interpretation is a question of law. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) An insurance policy is a contract between the insurer and the insured. As with all contracts, "the mutual intention of the parties at the time the contract is formed governs interpretation." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].) The parties' intent is inferred from the " 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' . . . . Thus, if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning." (*Id.* at p. 822.)

■ Liability insurers owe a duty to defend their insureds for claims that potentially fall within the policy's coverage provisions. "The carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." (*Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) However, in an action where no claim is even potentially covered, the insurer owes no duty to defend. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

### 2. *The National Insurance Policy*

In order to determine whether National owed Hameid a duty to defend, we must examine the CGL insurance policy at issue. As noted, the policy provides defense and indemnity coverage for "advertising injuries" if the injuries are "caused by an offense committed in the course of advertising [the insured's] goods and services." The coverage obligates National to defend an

action against the insured if the underlying lawsuit alleges (1) "advertising" by the insured, (2) an "advertising injury" offense as defined in the policy, and (3) a causal connection between the advertising injury and the third party claimant's damages. The "Umbrella Coverage Endorsement" in the same CGL insurance policy provides additional coverage for "advertising injury" under essentially identical terms.

Although the CGL insurance policy here does not define "advertising," it does define "advertising injury" to mean injury arising out of one or more offenses, including slander or libel; violation of the right to privacy; copyright, title or slogan infringement; and, at issue here, "[m]isappropriation of advertising ideas or style of doing business."[2] ■ Thus in order for Hameid to have a reasonable expectation of coverage under the National CGL policy for "advertising injury" he must show that: (1) he was engaged in "advertising" during the policy period when the alleged "advertising injury" occurred; (2) KWP's allegations created a potential for liability under one of the covered offenses (i.e., misappropriation of advertising ideas); and (3) a causal connection existed between the alleged injury and the "advertising." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1276 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*); *Peerless Lighting Corp. v. Am. Motorists Ins. Co.* (2000) 82 Cal.App.4th 995, 1009 [98 Cal.Rptr.2d 753] (*Peerless*).)

### 3. *Did Hameid's Activities Constitute "Advertising" Under the National CGL Insurance Policy?*

The parties do not dispute that KWP's alleged injuries occurred during the time National's policy was in effect. They do, however, disagree on (1) whether Hameid was involved in "advertising," and (2) whether KWP's allegations gave rise to a potential for coverage under the "advertising injury" policy provision. If we assume that taking trade secrets in the form of a customer list is an offense that may inflict advertising injury, we must then decide whether the offense occurred in the course of Hameid's advertising his salon's goods or services. In other words, does solicitation of customers from a customer list constitute "advertising" within the meaning of the CGL policy, and, if so, did the alleged advertising activity cause advertising injury?

---

[2] The term "style of doing business" refers to a company's comprehensive manner of operating. (See *Novell, Inc. v. Federal Ins. Co.* (D.Utah 1998) 141 F.3d 983, 986–988 [holding allegation that insured software company copied software developer's efforts did not trigger duty to defend under "advertising injury" portion of CGL policy as "misappropriation of style of doing business"]; see also *Poof Toy Prods. v. U.S. Fid. & Guar. Co.* (E.D.Mich. 1995) 891 F.Supp. 1228, 1232; *St. Paul Fire & Marine Ins. Co. v. Advanced International Systems, Inc.* (E.D.Va. 1993) 824 F.Supp. 583, affd. (4th Cir. 1997) 21 F.3d 424.) Because KWP did not allege that Hameid, Howard, or Billington misappropriated its comprehensive manner of operating, the underlying action did not assert claims connected to misappropriation of style of doing business.

The meaning of "advertising" in a CGL insurance policy has presented a problem for courts interpreting coverage. In *Bank of the West, supra,* 2 Cal.4th at page 1276, footnote 9, we interpreted a pre-1986 version of the CGL insurance policy. It covered advertising injury arising out of an offense that occurred during the course of the insured's advertising activities. (*Id.* at p. 1262.) We observed that, when interpreting CGL insurance policies, "courts have disagreed on the question of what constitutes 'advertising' . . . . Most of the published decisions hold that 'advertising' means widespread promotional activities directed to the public at large." (*Ibid.*) Although we did not decide the meaning of the term because the question was not before us, *Bank of the West* acknowledged that only a sparse minority of federal district court cases hold "that the term 'advertising' can also encompass personal solicitations." (*Id.* at p. 1276; see *Foxfire, supra,* 820 F.Supp. at p. 494; *American States Ins. Co. v. Canyon Creek* (N.D.Cal. 1991) 786 F.Supp. 821; and *John Deere Ins. Co. v. Shamrock Industries, Inc.* (D.Minn. 1988) 696 F.Supp. 434 (*John Deere*).)

Here, the Court of Appeal questioned *Bank of the West*'s statement that most courts have defined "advertising" to mean "widespread promotional activities directed to the public at large." The court relied on *Foxfire, supra,* 820 F.Supp. at page 494, which opined that whether an insured's activity is "advertising" under a CGL insurance policy hinges on "the context of the overall universe of customers to whom a communication may be addressed." *Foxfire* commented that "[w]here the audience may be small, but nonetheless comprises all or a significant number of a competitor's client base, the advertising activity requirement is met . . . . [W]here the business is one with a small customer base and that base, or a significant part of it, is the target audience, the reach is extensive enough to constitute advertising injury." (*Ibid.*; accord, *Amway Distribs. Benefits Ass'n v. Federal Ins. Co.* (W.D.Mich. 1997) 990 F.Supp. 936, 945 ["advertising comes in many forms and may differ in scope from business to business, depending on the product, the size of the company, the company's marketing system, or the size of the target market"]; *New Hampshire Ins. Co. v. R.L. Chaides Constr. Co., Inc.* (N.D.Cal. 1994) 847 F.Supp. 1452, 1456 (*Chaides*) ["[a]dvertising activity must be examined in the context of the overall universe of customers to whom a communication may be addressed; to hold otherwise would effectively preclude small businesses . . . from ever invoking their rights to coverage for advertising injury liability"].)

The Court of Appeal also relied on *Peerless, supra,* 82 Cal.App.4th at pages 1008–1009, which questioned whether "widespread promotional activities" "in fact [was] the rule adopted by a majority of published opinions." (*Ibid.*) *Peerless,* however, does not support the Court of Appeal's analysis. *Peerless* actually held that an insured's participation in a competitive bidding process on a single product involving a single customer did not constitute

"advertising" under the CGL insurance policy and rejected a duty to defend. (*Ibid.*) *Peerless* discussed several cases interpreting the advertising injury coverage and suggested that a majority of other jurisdictions do require widespread advertising to the public. *Peerless* also observed that only a few federal courts interpret advertising injury coverage to apply to personal solicitations to a limited number of individual customers. (*Id.* at pp. 1008–1010 [citing several cases following the "widespread promotion" approach, including *Select Design Ltd. v. Union Mut. Fire Ins.* (Vt. 1996) 165 Vt. 69 [674 A.2d 798] (*Select Design*)].)

██  Contrary to *Foxfire*, we prefer the majority approach as stated in *Bank of the West, supra,* 2 Cal.4th at page 1276, and interpret the term "advertising" as used in CGL policies to mean widespread promotional activities usually directed to the public at large.[3] The definition reflects the commonly understood meaning of the word.[4] As noted, a majority of the other jurisdictions that have considered the question have come to a similar conclusion.

In *Select Design, supra,* 674 A.2d 798, the insured sought a defense after being sued for allegedly using proprietary information, including a customer list that a competitor's former employee provided, to solicit the competitor's customers. The insured's CGL insurance policy provided coverage for "advertising injury." (*Id.* at p. 799.) The Vermont Supreme Court stated that the "majority view" defined "advertising" as "widespread distribution of promotional material to the public at large" partially because the majority "read the policy provisions according to their plain, ordinary meaning." (*Id.* at pp. 801–803.) The court reasoned that defining "advertising" to include customer solicitations would stretch too far: "If the act of contacting potential customers is advertising for the purposes of the policy, then any dispute related to economic competition among businesses is covered by the policy provision for advertising injury." (*Id.* at p. 803.) Thus, the court held that solicitation of the competitor's customers did not constitute "advertising" under the CGL insurance policy. (*Id.* at p. 802.)

---

[3] Hameid observes that the Insurance Services Office (ISO), which drafts the standard CGL insurance policies, defines "advertising" as "a notice that is broadcast or published in the general public or *specific market segments* for the purpose of attracting customers or supporters." (Mooning, *ISO Advertising and Personal Injury Revisions: Major Surgery or Just a Band-Aid Fix?* (1999) 4 Medley's Emerging Ins. Disputes 16, italics added.) We have limited our review to the question presented and do not have occasion to decide whether widespread promotional activities directed at specific market segments constitute advertising under the CGL policy.

[4] Hameid also claims the word "advertising" and the phrase "advertising ideas" are ambiguous because the CGL insurance policy does not define the terms. We have, however, held that "the absence from the policy of a definition of [a] term . . . does not by itself render the term ambiguous." (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.* (1993) 5 Cal.4th 854, 866–867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].)

In *Monumental Life Ins. Co. v. U.S. Fidelity & Guaranty Co.* (Md.Ct. Spec.App. 1993) 94 Md.App. 505 [617 A.2d 1163], the insured was accused of mailing recruiting letters to a competitor's employees and courting a competitor's customers with a personal solicitation that caused many of them to defect. When the insured sought a defense under the "advertising injury" coverage of its CGL insurance policy, the trial court determined the insured's alleged activities were not "advertising." The Maryland Court of Special Appeals affirmed. It distinguished between "advertising" and "solicitation," stating that "[t]he lower court clearly viewed advertising and solicitation as mutually exclusive, the difference being that advertising must be of a public nature." (*Id.* at p. 1173.) The Court of Appeals agreed "with the lower court that there is no *bona fide* ambiguity in the language of the policies at issue, nor is there any legitimate doubt as to its application under the circumstances. 'Advertising' means *advertising*, i.e., 'widespread distribution or announcements to the public.' Consequently, Monumental's individual, one-to-one solicitations were clearly *not* 'advertising' within the normal meaning of the word and, accordingly, the lower court acted properly." (*Id.* at p. 1174.)

A federal district court applying Virginia law similarly recognized that "advertising" means "widespread distribution of promotional material to the public at large." (*Solers, Inc. v. Hartford Cas. Ins. Co.* (E.D.Va. 2001) 146 F.Supp.2d 785, 795 (*Solers*).) In *Solers*, a subcontractor sought a defense under the "advertising injury" provision of its liability insurance policy after allegedly using proprietary information to submit bids on two government contracts. The insured claimed that "[w]idespread public dissemination of solicitation material is not appropriate for [its] business," and that "its only advertising mechanism is the submission of written business proposals." (*Id.* at p. 790.) Thus, the insured asserted that "the [c]ourt must find that the proposals constitute advertising because to hold otherwise on the grounds that the proposals are not directed at the public at large would be to hold that companies with small, but well-defined markets cannot, as a matter of law, engage in advertising." (*Ibid.*)

The district court rejected the insured's contention, holding that the subcontractor's bids were "not covered by the [p]olicy because such submissions were not 'widespread distribution of promotional material to the public at large.'" (*Solers, supra,* 146 F.Supp.2d at p. 790, quoting *Playboy Enterprises, Inc. v. St. Paul Fire & Marine Ins. Co.* (7th Cir. 1985) 769 F.2d 425, 428–429 [applying Illinois law].) The district court also pointed out that "small businesses are not limited to insurance coverage for claims based in 'advertising injury' for the protection of their profession. Small businesses may obtain broad coverage by purchasing several forms of insurance, including coverage for errors and omissions liability, directors and officers liability, and completed operations and products liability." (*Solers, supra,* 146 F.Supp.2d at p. 796, fn. 2.) There is no evidence in this action that Hameid obtained any such small business insurance coverage that may have assisted him in defending the KWP action.

Massachusetts, Missouri, Illinois, and Kansas have also defined "advertising" as "widespread promotional activities directed to the public at large."[5] (See *Smartfoods, Inc. v. Northbrook Property & Cas. Co.* (1993) 35 Mass. App.Ct. 239 [618 N.E.2d 1365, 1368] (*Smartfoods*) [affirming judgment that insurer owed no duty to defend when insured allegedly solicited distributors by mail because "[w]ide dissemination of information is typically the objective of advertising"]; *American States Ins. Co. v. Vortherms* (Mo.Ct.App. 1999) 5 S.W.3d 538, 542 [affirming determination based on "numerous cases as authority for holding 'advertising' involves the widespread distribution of promotional material to the public at large"]; *Internl Ins. Co. v. Florists Mut. Ins. Co.* (1990) 201 Ill.App.3d 428 [559 N.E.2d 7, 10, 147 Ill.Dec. 7] [stating "the term 'advertising' has been held to refer to the widespread distribution of promotional material to the public at large"]; *MGM, Inc. v. Liberty Mut. Ins. Co.* (1992) 17 Kan.App.2d 492, 839 P.2d 537, 540 ["We find that, in sum, the term 'advertising' as used in Liberty Mutual's policy means public or at least widely disseminated solicitation or promotion"].)[6]

---

[5] *Zurich Ins. Co. v. Amcor Sunclipse N.A.* (7th Cir. 2001) 241 F.3d 605, 608, explains that "[m]ost cases concerning advertising injury seem to arise between parties of diverse citizenship, at least one of which prefers federal court." Thus, it seems few state courts have explicitly considered the question. Compounding the difficulty of finding specific holdings defining "advertising" is the fact courts often dispose of unmeritorious claims of "advertising injury" through other avenues. (See, e.g., *Associated Aviation Underwriters, Inc. v. Vegas Jet, LLC* (D.Nev. 2000) 106 F.Supp.2d 1051, 1056 [holding insured did not prove causal connection between alleged injury and "advertising" activity].)

[6] In addition, New Hampshire and Minnesota have made similar rulings. (See *First Bank & Trust Co. v. New Hampshire Ins. Group* (1983) 124 N.H. 417 [469 A.2d 1367, 1368] [affirming judgment that " 'the mere explanation of bank services to a couple in a private office cannot be considered 'advertising' "]; *Fox Chem. Co. v. Great American Ins. Co.* (Minn. 1978) 264 N.W.2d 385, 386 [determining that sending 400 copies of a pamphlet to aid distributors in training salespeople was not "advertising" as used in insurance policy exclusion because

Recent decisions interpreting California law also apply the majority definition of "advertising." The Seventh Circuit, applying California law, concluded individual solicitations are not advertising because California would not "depart from the normal understanding of 'advertising.' " (*Zurich Ins. Co. v. Amcor Sunclipse N.A., supra,* 241 F.3d at p. 608 (*Amcor Sunclipse*); see also *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.* (2001) 92 Cal.App.4th 205, 217 [111 Cal.Rptr.2d 670] [commonly understood meaning of the term "advertising" is "widespread promotional activities"]; *Zimon v. Fireman's Fund Ins. Co.* (1999) 73 Cal.App.4th 1382, 1388–1389 [87 Cal.Rptr.2d 397] [insured could not reasonably have thought painting placed in lobby of building to attract new tenants fell under "advertising injury" coverage].)

In addition to propounding *Foxfire*'s minority view, Hameid asks us to adopt the approach taken in *John Deere, supra,* 696 F.Supp. 434. In *John Deere,* a Minnesota district court held that three letters extolling the virtues of a pail-filling machine constituted "advertising." The district court noted that "[w]hile activity directed at one customer seems to stretch the meaning of advertising, Black's Law Dictionary's definition of 'advertise' encompasses any form of solicitation, presumably including solicitation of one person." (*Id.* at p. 440.) Mirroring this argument, Hameid contends that "[a]dvertising is defined by Black's Law Dictionary as: 'To advise, announce, apprise, command, give notice of, inform, make known, publish. To call a matter to public attention by any means whatsoever. Any oral, written, or graphic statements made by the seller in any manner in connection with the solicitation of business and includes: . . . statements and representations . . . contained in any notice, handbill, sign, catalog, or letter.' "

National points out, however, that the most recent edition of Black's Law Dictionary has deleted the sentences on which both Hameid and the *John Deere* court rely. (See Black's Law Dict. (7th ed. 1999) p. 55 [defining "advertising" as "[t]he action of drawing the public's attention to something to promote its sale" or "[t]he business of producing or circulating advertisements"].)[7] Black's less expansive definition, and its use of the words "public attention," indicate that "advertising" does not encompass personal solicitations. In addition, *Smartfoods, supra,* 618 N.E.2d at page 1368, criticized *John Deere,* calling it "unpersuasively reasoned" and noting that "[w]e doubt that every pitch made by one businessman in a letter to another constitutes

---

"public or widespread distribution of the . . . material" was necessary for it to be considered advertising].)

[7] Random House Webster's Dictionary (2d ed. 1997) also defines "advertising" in a way that reflects "widespread promotional activities directed to the public at large," stating that it is the "act or practice of calling to public attention one's product, service, need, etc., esp. by paid announcements in newspapers and magazines, over radio or television, on billboards, etc." (*Id.* at p. 29.)

advertising as the word is understood in American usage." Thus, *John Deere*, which frankly acknowledged that its interpretation "seemed to stretch the meaning of advertising," offers Hameid little support.[8] (*John Deere, supra,* 696 F.Supp. at p. 440.)

Hameid also relies on *Ford Dealers Assn. v. Dept of Motor Vehicles* (1982) 32 Cal.3d 347, 355 [185 Cal.Rptr. 453, 650 P.2d 328] (*Ford Dealers*) and its definition of "advertising" found in a regulation promulgated under the Vehicle Code. As defendant National observes, *Ford Dealers* reviewed an administrative regulation the Department of Motor Vehicles adopted under the former Administrative Procedure Act to address vehicle licensing and business. As National also observes, *Ford Dealers* recognized that its role was a "limited one" that involved inquiring into a regulation's validity, not its wisdom. (*Ford Dealers, supra,* 32 Cal.3d at p. 355.) The Legislature amended Vehicle Code section 11713 to make it unlawful for an auto dealer to " 'make or disseminate . . . before the public . . . in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement which is untrue or misleading.' " (*Ford Dealers, supra,* 32 Cal.3d at p. 357.)

As National points out, *Ford Dealers* upheld the administrative regulation that defined "advertising" "in the broad context of Vehicle Code Section 11713[,subdivision] (a)" to include statements communicated to the public. (*Ford Dealers, supra,* 32 Cal.3d at p. 356.) Initially, we note that we do not find compelling the interpretation of regulations in a statutory context like the Vehicle Code rather than an insurance context. (See, e.g., *Bluehawk v. Continental Ins. Co.* (1996) 50 Cal.App.4th 1126, 1131–1132 [58 Cal.Rptr.2d 147].) But as National also observes, the challenged regulation also provided, that "advertising" refers to a " 'statement, representation, act or announcement intentionally communicated to the public generally for the purpose of arousing desire to buy or patronize.' " (*Ford Dealers, supra,* 32 Cal.3d at p. 357.) Thus, even under *Ford Dealers,* the common understanding of the term "advertising" includes its public character.

Finally, we consider the approach the *Foxfire* court itself took. (*Foxfire, supra,* 820 F.Supp. at p. 494.) As mentioned, *Foxfire* held that courts should determine whether activities are "advertising" on a case-by-case basis, noting to whom the promotions are directed. (*Ibid.*) We disagree. Due to the pervasiveness of CGL insurance policies, and of advertising, if we adopted

---

[8] Hameid does not mention *American States Ins. Co. v. Canyon Creek, supra,* 786 F.Supp. at page 821, the second case cited in *Bank of the West* as an example of an exception to the majority rule. Notably, *American States* also relied in part on a definition of "advertising" found in an older edition of Black's. (See *American States* at p. 828 [quoting now deleted language from Black's Law Dict. (5th ed. 1979) p. 50].)

*Foxfire*'s malleable definition, we likely would encourage litigation. ■ Giving identical policy language different meanings for different insureds would eliminate the clarity and certainty that is essential to the insurance industry. Standardization of policy terms is important to insurers and insureds alike. It enables insurers to compare losses and calculate rates and premiums so that rates remain stable, and not based on destabilizing ad hoc views of a particular coverage. It also gives effect to the parties' mutual intent as it existed at the time of contracting, so far as that intent is ascertainable and lawful. (Civ. Code, § 1636.) In other words, the majority view defines "advertising" to mean the widespread distribution of promotional materials to the public at large because it interprets the contractual term under its ordinary and popular meaning. It allows uniformity in interpretation under different factual circumstances that may or may not lead to coverage. (See *Amcor Sunclipse, supra,* 241 F.3d at p. 608 [concluding individual solicitations are not advertising because California would not depart from the normal understanding of the term].) Because the parties' mutual intention is to be inferred, if possible, solely from contract's written provisions, the clear and ordinary meaning of those terms should control our interpretation. (See *AIU Ins. Co. v. Superior Court, supra,* 51 Cal.3d at pp. 821–822.)

In addition, we are not persuaded by *Foxfire*'s assertion that adopting the majority approach "would effectively preclude small businesses . . . from ever invoking their rights to coverage for advertising injury liability." (*Foxfire, supra,* 820 F.Supp. at p. 494; see also *Chaides, supra,* 847 F.Supp. at p. 1456.) Under the proposed definition of "advertising," small businesses like Hameid's may still rely on CGL coverage for "advertising injury" if they place spots on the radio or television, buy space on billboards or bus benches, or take out advertisements in newspapers directed to the public at large, and their content caused advertising injury. Therefore, we conclude that excluding personal solicitations from the definition of "advertising" in the CGL insurance policy will not foreclose small businesses from invoking their rights under CGL insurance policies or from otherwise purchasing insurance protection that does cover potential liability for such solicitations. (*Solers, supra,* 146 F.Supp.2d at p. 795, fn. 2.)

■ Here, KWP alleged Howard and Billington made telephone calls and sent mailers to Bellezza customers advising them of their new location and of Hameid's lower prices. These activities strongly resemble the solicitations of a competitor's customers in *Select Design, supra,* 674 A.2d at pages 801–803; the recruiting letters to a competitor's employees in *Monumental Life Ins. Co. v. U.S. Fidelity & Guaranty Co., supra,* 617 A.2d at page 1173;

and the subcontractor's submission of bids in *Solers, supra,* 146 F.Supp.2d at page 795—all of which were held to be "solicitation," not "advertising."[9]

## CONCLUSION

We conclude that Hameid has failed to show KWP alleged any cause of action amounting to a potentially covered offense under the National CGL insurance policy. We therefore reverse the Court of Appeal on the issue of National's duty to defend and remand the matter for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 10, 2003.

---

[9] Because we conclude no advertising occurred, we find it unnecessary to decide whether the insured misappropriated advertising ideas or whether there was a causal connection between the claimed misappropriation and the alleged advertising injury. In addition, we have considered, but find unpersuasive, Hameid's reliance on additional authorities filed in his two supplemental briefs.