[No. H035316. Sixth Dist. Sept. 6, 2011.]

DAVID FELDMAN, Plaintiff and Appellant, v.
ILLINOIS UNION INSURANCE COMPANY, Defendant and Respondent.

## COUNSEL

Shernoff, Bidart, Echeverria, Michael J. Bidart, Ricardo Echeverria, Steven Schuetze; Adleson, Hess & Kelly and Randy Hess for Plaintiff and Appellant.

Wilson, Elser, Moskowitz, Edelman & Dicker and Darren LeMontree for Defendant and Respondent.

## OPINION

**ELIA, J.**—In this appeal plaintiff David Feldman seeks review of a summary judgment entered in favor of Illinois Union Insurance Company, which had declined to defend or indemnify Feldman or his company, ZF Micro Solutions, against a cross-action by a third party. Feldman contends that the superior court erroneously found no potential for coverage under the liability policy issued to him and ZF Micro Solutions and therefore no duty to defend or indemnify the insureds. We agree with the superior court that the claims made by the third party during the policy period were excluded from coverage. Accordingly, we must affirm the judgment.

### Background

Appellant David Feldman is the president and chief executive officer of ZF Micro Solutions, Inc. (referred to by the parties as "ZF Solutions"). ZF Solutions is the successor company to ZF Micro Devices, Inc. (ZF Devices), replacing the latter as of March 1, 2002. As it represents itself, ZF Solutions designs, markets, and sells semiconductor devices "into the embedded microprocessor market."

### 1. The Underlying Litigation

On April 25, 2002, ZF Solutions sued National Semiconductor Corporation (NSC) for failing to produce devices for ZF Solutions in accordance with the parties' contract. On May 28, 2002, NSC filed a cross-complaint against both ZF Devices and ZF Solutions (as successor) for failure to pay for custom integrated circuits (chips) it had produced and sent to ZF Devices in accordance with the same contract.

NSC filed a first amended cross-complaint one year later, on April 25, 2003.[1] In this pleading NSC added Feldman and two others as cross-defendants and asserted new causes of action against the cross-defendants,

---

[1] For some reason the plaintiff in this insurance action referred to a *second* amended cross-complaint as having been filed on April 25, 2003, and having been rejected by Illinois

including breach of fiduciary duty and fraudulent transfer of assets from ZF Devices to ZF Solutions. In June 2004 the litigation between ZF Solutions and NSC culminated in a jury verdict finding both ZF Solutions and NSC liable to each other.[2]

## 2. *The Insurance Litigation*

From November 23, 2001, to July 1, 2002, ZF Solutions was insured by a liability policy issued by "certain Underwriters at Lloyd's, London" (Underwriters). That policy covered directors and officers as well as the corporation. Respondent Illinois Union Insurance Company (Illinois Union) covered ZF Solutions and its directors and officers from July 1, 2002, to July 1, 2003.

On about March 28, 2003, Feldman tendered the defense of NSC's amended cross-complaint to Illinois Union through the insurance broker. Illinois Union denied coverage, asserting that NSC's claim had originally been made on May 28, 2002, before the inception date of the Illinois Union policy. Illinois Union also asserted exclusions for claims involving a contract and claims involving fraudulent acts by any of the insureds. In a written request for reconsideration, the insurance broker pointed out that the claim that was tendered was not for breach of contract but only for breach of fiduciary duty and related allegations against new defendants, including Feldman. Illinois Union, however, adhered to its denial of defense and indemnity based on lack of coverage. This time the company invoked a policy provision that deemed "Interrelated Wrongful Acts" to constitute a single claim and that required such a claim to be made during the policy period. Under this provision, Illinois Union explained, NSC's claim was made before the inception date of the policy.

ZF Solutions, ZF Devices, and Feldman then brought this action against both Illinois Union and Underwriters, which had also denied coverage.[3] In plaintiff's first amended complaint only Feldman asserted claims against Illinois Union, for declaratory relief (fourth cause of action), breach of insurance contract (fifth cause of action), and breach of the covenant of good faith and fair dealing (sixth cause of action).[4] In the fourth cause of action he

---

Union. The only pleading filed on that date, however, is the first amended cross-complaint; the record before us indicates no further amendments by NSC.

[2] ZF Solutions, having obtained the greater recovery, was declared the prevailing party entitled to costs.

[3] Underwriters obtained summary judgment on the ground that plaintiff had failed to provide timely notice of the NSC claim. We upheld that ruling on appeal.

[4] The superior court denied a motion by the ZF entities and Feldman for leave to file a second amended complaint restoring ZF Solutions and ZF Devices as plaintiffs in the fourth through sixth causes of action.

sought a declaration that Illinois Union owed a duty to defend him in the NSC cross-action and to indemnify him for the resulting judgment.

Illinois Union moved for summary judgment, or alternatively, summary adjudication, on the ground that there was no potential for coverage under its liability policy. Illinois Union argued that (1) NSC's claims were first made before the policy period began; (2) no coverage was available under an insolvency exclusion of the policy; and (3) an allegation that Feldman had illegally recorded a telephone conversation was not covered under the privacy exclusion.

In his opposition Feldman maintained that he was alleging "new and different wrongful acts" which were "not causally connected and independent of the wrongful acts alleged in the original cross-complaint." Feldman specifically pointed out that the original cross-complaint had alleged breach of contract, which was not a covered claim under the Illinois Union policy, and successor liability, which was a claim directed at ZF Solutions, not him. Feldman further disputed the applicability of the insolvency exclusion because the ZF entities were not insolvent.

The superior court, however, was unconvinced by Feldman's position. The court determined that the policy definition of "Interrelated Wrongful Acts" encompassed both NSC's original cross-complaint and its subsequent pleading, the first amended cross-complaint. The court took note of allegations in the original NSC cross-complaint that pertained to the same wrongful acts as those alleged in the later pleading. The court acknowledged that Feldman was a new defendant in NSC's first amended cross-complaint and that its third cause of action bore a new title: fraudulent conveyance and conspiracy; but that pleading also "repeat[ed] allegations that were clearly first made in the original cross-complaint" and asserted that the ZF entities were alter egos of Feldman. Because Feldman had not raised any disputed issues of fact, the court summarily adjudicated the fourth through sixth causes of action against him. Feldman timely appealed from the ensuing judgment on January 21, 2010, dismissing Illinois Union from the action.[5]

---

[5] In dismissing Illinois Union from the action, the court's judgment included a declaration that Illinois Union had no duty of defense or indemnity to the ZF entities or to Feldman. We note, however, that only Feldman was proceeding against Illinois Union. Nevertheless, the court's statement obviates any question as to whether an obligation remained as to NSC's third cause of action, which included ZF Devices and ZF Solutions as perpetrators of the alleged fraudulent conveyance and conspiracy.

*Discussion*

## 1. *Standard and Scope of Review*

■ "Liability insurers owe a duty to defend their insureds for claims that potentially fall within the policy's coverage provisions. 'The carrier must defend a suit which potentially seeks damages within the coverage of the policy.' (*Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) However, in an action where no claim is even potentially covered, the insurer owes no duty to defend. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46 [65 Cal.Rptr.2d 366, 939 P.2d 766].)" (*Hameid v. National Fire Ins. of Hartford* (2003) 31 Cal.4th 16, 21 [1 Cal.Rptr.3d 401, 71 P.3d 761], italics omitted.)

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Summary judgment is properly granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "Summary judgment is an appropriate vehicle to determine coverage under an insurance policy when it appears there is no material issue of fact to be tried and the sole issue before the court is one of law . . . ." (*Pepper Industries, Inc. v. Home Ins. Co.* (1977) 67 Cal.App.3d 1012, 1017 [134 Cal.Rptr. 904]; accord, *Slater v. Lawyers' Mutual Ins. Co.* (1991) 227 Cal.App.3d 1415, 1419 [278 Cal.Rptr. 479].)

When, as here, an insured asserts a duty of the liability insurer to defend the insured in an action by a third party, whether the policy provides a potential for coverage and a duty to defend calls for interpretation of an insurance policy and thus is a question of law. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Accordingly, "[t]he insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there is no coverage." (*Smith Kandal Real Estate v. Continental Casualty Co.* (1998) 67 Cal.App.4th 406, 414 [79 Cal.Rptr.2d 52]; accord, *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589].) In reviewing an order granting summary judgment to the insurer based on the interpretation or application of policy terms, we apply a de novo standard. (*Smith Kandal Real Estate v. Continental Casualty Co., supra*, 67 Cal.App.4th at p. 414.)

■ A complaint is to be "liberally construed" in favor of potential coverage (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 23) and

"[a]ny doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. [citation]" (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792]). Nevertheless, the duty to defend "extends beyond claims that are actually covered to those that are merely potentially so—but no further." (*Buss v. Superior Court, supra,* 16 Cal.4th at p. 47.) " '[I]n an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. [Citation.] "This freedom is implied in the policy's language. It rests on the fact that the insurer has not been paid premiums by the insured for [such] a defense. . . . [T]he duty to defend is contractual. 'The insurer has not contracted to pay defense costs' for claims that are not even potentially covered." [Citation.]' " (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 655 [31 Cal.Rptr.3d 147, 115 P.3d 460].)

" '[T]he insured " 'may not speculate about [unpleaded] third party claims to manufacture coverage' " [citation], and the insurer has no duty to defend where the potential for liability is " 'tenuous and farfetched.' " [Citation.] The ultimate question is whether the facts alleged "fairly apprise" the insurer that the suit is upon a covered claim. [Citation.]' " (*Shanahan v. State Farm General Ins. Co.* (2011) 193 Cal.App.4th 780, 786 [122 Cal.Rptr.3d 572], quoting *Michaelian v. State Comp. Ins. Fund* (1996) 50 Cal.App.4th 1093, 1106 [58 Cal.Rptr.2d 133].)

## 2. *Illinois Union's Exclusion for "Interrelated Wrongful Acts"*

The Illinois Union policy was a "claims-made policy"[6] covering ZF Solutions and its directors and officers. Under the "Directors & Officers" clause, Illinois Union agreed to pay "Loss resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act." The term "Wrongful Act" was defined as "any actual or alleged error, omission, misleading statement, neglect, breach of duty or act" by any director or officer acting in that capacity.

Section D of the policy set forth the insurer's "LIMIT OF LIABILITY AND RETENTIONS." Among those restrictions was the following provision: "3. More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times: [¶] (a) the

---

[6] A claims-made policy is identified by the promise of the carrier to " 'assume liability for any errors, including those made prior to the inception of the policy as long as a claim is made during the policy period.' " (*Pacific Employers Ins. Co. v. Superior Court* (1990) 221 Cal.App.3d 1348, 1356–1357 [270 Cal.Rptr. 779].)

time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Act is first made . . . ."

At issue here is the applicability of "Interrelated Wrongful Acts." That term was defined in the policy as "more than one Wrongful Act which have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions." To determine whether NSC's claims involved "Interrelated Wrongful Acts," it is necessary to compare the allegations of its original complaint (which was filed before the Illinois Union policy period began) and its first amended complaint.

### 3. *Examination of NSC's Claims*

NSC's original cross-complaint stated the following facts. NSC twice agreed to an extension of the payment deadline for the products it had delivered to ZF Devices, because "ZF Devices was unable to pay the debt." Subsequently, however, ZF Devices notified its shareholders, of which NSC was one, "that the company was on the brink of financial failure and seeking two million dollars in private funding." The notice also informed shareholders that Gary Kennedy, a member of the board of directors, would be the new CEO of ZF Devices. On January 22, 2002, ZF Devices announced that it would terminate operations by the end of the month, and that Kennedy would be acquiring its assets. The following month, the "Kennedy Trust" " 'foreclosed' " and a purported assignment of those assets took place from ZF Devices to the Kennedy Trust; then, ZF Solutions acquired "some of the assets" of ZF Devices, including the agreement with NSC, while ZF Devices still owed NSC "at least" $833,715.92 plus interest.

NSC further alleged that the assignment of its contract and the transfer of assets from ZF Devices to ZF Solutions was made "for the fraudulent purpose of escaping liability for ZF Devices' debts, particularly the debt to [NSC] under the Agreement." NSC complained that the contract with ZF Devices required its consent before any assignment of rights or obligations, and it asserted that it had never consented to any such assignment "from ZF Devices or the Kennedy Trust to ZF Solutions." Because the Kennedy Trust had "no right to purport to assign the Agreement to ZF Solutions, without [NSC's] consent," NSC had no contractual relationship with ZF Solutions. On the other hand, NSC also asserted that "it was the intent of ZF Devices and ZF Solutions for ZF Solutions to be a mere continuation of ZF Devices," and thus ZF Solutions, by holding itself out "to the world" as such, was liable for the debts of ZF Devices.

Notwithstanding its allegations of fraudulent transfer, NSC's cross-complaint contained only two causes of action: breach of contract against

both ZF Devices and ZF Solutions, and "Successor Liability" against ZF Solutions.[7] The amended cross-complaint, however, expanded NSC's theories of recovery and added Feldman, Kennedy, and the Kennedy Trust as defendants. Again NSC asserted that the "fraudulent transfer" of ZF Devices assets to Feldman and ZF Solutions, via the purported foreclosure and assignment to the Kennedy Trust, was made to "hinder, delay or defraud" creditors, including NSC. But this time NSC added to the original claims of breach of contract and successor liability a third cause of action alleging "Fraudulent Conveyance and Conspiracy" against these five defendants and a sixth cause of action against them all for violation of Business and Professions Code section 17200 based on the same fraudulent transfer. In the fourth cause of action NSC asserted against Feldman and Kennedy breach of fiduciary duty amounting to self-dealing and a conflict of interest, arising from the same "fraudulent transfer," with the result that NSC was deprived of the $2.4 million value of its equity interest in ZF Devices in addition to the amount owed under the NSC-ZF Devices agreement.

In this new pleading NSC described in more detail its efforts to "assist ZF Devices to remain financially viable," not only by granting the payment extensions, but also by offering to sell chips directly to NSC's customers and by investing directly in ZF Devices. NSC also elaborated on the interactions between ZF Devices and the Kennedy Trust and the details of the "purported 'foreclosure' sale" and transfer of assets, which NSC characterized as the product of "collusive transactions" designed to "hinder, delay or defraud creditors" such as NSC. By depriving ZF Devices of its assets, the cross-defendants rendered the company unable to continue operations or meet its obligations to shareholders and creditors, to the detriment of NSC and the benefit of all the defendants. NSC repeated its assertion that the assignment of assets had violated the contractual requirement of its consent, resulting in no contractual relationship with the successor, ZF Solutions; but again it claimed that ZF Solutions had successor liability for the debts of ZF Devices.

Finally, NSC added facts related to a new allegation, that Feldman had secretly recorded two confidential telephone conversations with NSC executives, in February and March 1999, and later disclosed a transcript of each conversation to third parties without NSC's consent. These facts formed the basis of the fifth cause of action for invasion of privacy, in violation of Penal Code section 630 et seq.

---

[7] In the second cause of action NSC repeated the allegation that "[t]he alleged transfer of assets from ZF Devices to ZF Solutions was for the fraudulent purpose of escaping liability for ZF Devices' debts, particularly the debts to [NSC] under the Agreement."

■ It is apparent from a comparison of the cross-complaint and amended cross-complaint that the later pleading included many new details of the events contributing to the alleged liability of Feldman, the Kennedy Trust, and Kennedy, as well as the ZF entities. But these details all pertained to the alleged fraudulent assignment and transfer of ZF Devices assets to ZF Solutions, made with the intent (and effect) of avoiding the former company's $833,715.92 obligation to NSC. Thus, while NSC expanded its theories of recovery, three of the four new causes of action asserted against Feldman— fraudulent conveyance and conspiracy, breach of fiduciary duty, and unfair business competition—had "as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions" in relation to the original cross-complaint. These claims were therefore properly deemed to constitute a single claim, which was originally made in April 2002, before the inception of the Illinois Union policy.

Only the fifth cause of action, for invasion of privacy,[8] arguably pertained to a different set of circumstances.[9] Feldman maintains that this claim triggered Illinois Union's duty to defend the entire action. Illinois Union correctly observes, however, that its policy excluded coverage for illegally recorded conversations. The first paragraph under "EXCLUSIONS" stated: "Insurer shall not be liable to make any payment under this [Directors and Officers] Coverage Section in connection with any Claim: [¶] a) for actual or alleged . . . invasion of privacy . . . ." Feldman does not address this provision; he only asserts the right of corporations to bring a civil claim for damages under Penal Code section 637.2 and notes that the policy provided coverage for wrongful acts. Because the policy clearly excluded this claim for invasion of privacy, it could not have triggered any duty to defend against NSC's cross-action.

In summary, we agree with the superior court that none of the claims NSC asserted in its amended cross-complaint was potentially covered under the Illinois Union policy. Consequently, Illinois Union had no duty of defense or indemnity toward Feldman. In light of this conclusion, it is unnecessary to determine the applicability of the policy's insolvency exclusion.

---

[8] Penal Code section 632 prohibits a party to a telephone conversation from "secretly or surreptitiously recording the conversation, that is, from recording the conversation without first informing all parties to the conversation that the conversation is being recorded." (*Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 118 [45 Cal.Rptr.3d 730, 137 P.3d 914].) Violation of this section may subject the person to civil liability. (Pen. Code, § 637.2.)

[9] NSC's claim did not identify the subject matter of the illegally recorded conversations or even indirectly identify their relationship to the acts that formed the basis of the other causes of action.

*Disposition*

The judgment is affirmed.

Rushing, P. J., and Premo, J., concurred.