[No. D043455. Fourth Dist., Div. One. Apr. 1, 2005.]

ROMBE CORPORATION, Plaintiff and Appellant, v.
ALLIED INSURANCE COMPANY et al., Defendants and Respondents.

COUNSEL

The Affinity Law Group and Gregory P. Goonan for Plaintiff and Appellant.

Miller Law Firm, Jon B. Miller and Scott A. Johnson for Defendants and Respondents.

OPINION

**BENKE, Acting P. J.**— ■  In *Hameid v. National Fire Ins. of Hartford* (2003) 31 Cal.4th 16, 24 [1 Cal.Rptr.3d 401, 71 P.3d 761] (*Hameid*), the court considered the scope of the term "advertising" as it is used in standard commercial general liability (CGL) insurance policies. The court found that "advertising" and "solicitation" are mutually exclusive terms. Because CGL policies do not cover liability incurred for acts of solicitation, the court found that a claim arising solely out of the appellant's solicitation of individuals was not covered by the appellant's CGL policy.

Here we consider a variant of the CGL policy, which, unlike the policy considered in *Hameid*, contained the following definition of advertisement: " '**Advertisement**' means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." Contrary to appellant's argument, this definition, while not considered by the court in *Hameid*, did not expand the scope of the policy's advertising coverage to include personal promotion or solicitation of business.

Because the record here does not disclose the occurrence of any activity which was covered under the advertising provisions of appellant's policy, the trial court did not err in granting the insurer's motion for summary judgment.

SUMMARY

A. *The Underlying Claim*

In June 2001 plaintiff Rombe Corporation (Rombe) was a franchisee of TRC Staffing Services (TRC), a nationwide temporary employment agency. On June 6, 2001, Rombe invited customers and employees of its franchise to a breakfast meeting at a hotel. At the meeting Rod Beals, one of Rombe's

principals, announced that Rombe would no longer be affiliated with TRC. Rather, Beals announced Rombe would be starting a new employment agency, Smart Staffing Solutions. Beals asked those in attendance to become customers and employees of the new agency. The breakfast meeting and Rombe's plans were later reported in an Internet newsletter.

On the following day, June 7, 2001, Rombe sent TRC a letter advising TRC that Rombe would not be renewing its franchise agreement when that agreement expired on September 8, 2001.

On September 10, 2001, TRC sued Rombe. TRC alleged causes of action for breach of contract, misappropriation of trade secrets and unfair competition.

## B. *Coverage Litigation*

At the time TRC filed its complaint against Rombe, Rombe was covered by a premier businessowners policy issued by defendant AMCO Insurance Company (AMCO). The policy AMCO issued was in many important respects similar to the CGL policy considered in *Hameid.* Like the policy in *Hameid,* AMCO's policy provided liability coverage for "advertising injuries." Like the policy considered in *Hameid,* the advertising offenses covered by AMCO's policy included: slander or libel; violation of the right to privacy; copyright, title or slogan infringement; and misappropriation of advertising ideas or style of doing business. As we noted at the outset, unlike the policy considered in *Hameid,* the AMCO policy included the following definition of advertisement: "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."[1]

Rombe tendered defense of the TRC complaint to AMCO. Because AMCO did not believe the complaint or any information provided by Rombe disclosed the existence or potential existence of any covered claim, AMCO declined Rombe's tender of defense.

TRC and Rombe eventually entered into a settlement agreement.

---

[1] This definition was drafted by the Insurance Services Office (ISO), which drafts standard insurance policies. (*Hameid, supra,* 31 Cal.4th at p. 24.) Because the policy the court was considering in *Hameid* did not contain this definition, the court did "not have occasion to decide whether widespread promotional activities directed at specific market segments constitute advertising under the CGL policy." (*Id.* at p. 24, fn. 3.)

After settling with TRC, Rombe filed a complaint against AMCO,[2] alleging that in failing to provide it with a defense to the TRC claim, AMCO was liable for breach of contract and breach of the covenant of good faith and fair dealing. Rombe filed a motion for summary adjudication and AMCO filed a cross-motion for summary judgment.

The trial court granted AMCO's motion. Although the trial court found that the "market segment" qualification in the policy's definition of advertisement might be broad enough to include the breakfast Rombe hosted, neither the breakfast nor the press report involved any use of TRC's advertising idea or any other covered advertising offense. Judgment was entered in favor of AMCO, and Rombe filed a timely notice of appeal.

## DISCUSSION

### I

Summary judgment may be granted only when a moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) Where the motion is brought by a defendant, the defendant will bear the burden of persuasion that " 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) In accordance with federal law, "All that the defendant need do is to 'show[] that one or more elements of the cause of action . . . cannot be established' by the plaintiff. [Citation.] In other words, all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*. Although he remains free to do so, the defendant need not himself conclusively negate any such element—for example, himself prove *not X*." (*Aguilar, supra*, 25 Cal.4th at pp. 853–854, fns. omitted.)

In broadly outlining the law of summary judgment, the Supreme Court stated: "If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment. In such a case . . . the 'court should grant' the motion 'and avoid a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device." (*Aguilar, supra*, 25 Cal.4th at p. 855.)

---

[2] Rombe also named Allied Insurance and Nationwide Insurance as defendants. All references to AMCO include Allied Insurance and Nationwide Insurance.

■ Importantly, as AMCO points out, we review the "trial court's ruling, not its rationale; thus, we are not bound by the trial court's stated reasons for granting summary judgment." (*California Automobile Ins. Co. v. Hogan* (2003) 112 Cal.App.4th 1292, 1297 [5 Cal.Rptr.3d 761]; accord *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].)

## II

■ Familiar principles govern adjudication of the insurer's duty to defend. "In *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076 [17 Cal.Rptr.2d 210, 846 P.2d 792] (*Horace Mann*) we observed: '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. (*Gray v. Zurich Insurance Co.* [(1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168] (*Gray*)]. As we said in *Gray*, "the carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." (*Id.* at p. 275, italics in original.) Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]' (*Horace Mann, supra,* 4 Cal.4th at p. 1081.)

■ " 'The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. (*Gray, supra,* 65 Cal.2d at p. 276.)' (*Horace Mann, supra,* 4 Cal.4th at p. 1081.) As one Court of Appeal has put it, '[f]or an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy of insurance, but upon those facts known by the insurer at the inception of a third party lawsuit. [Citation.] Hence, the duty "may exist even where coverage is in doubt and ultimately does not develop." [Citation.]' (*Saylin v. California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 263 [224 Cal.Rptr. 493]. [¶] . . . [¶]

"The insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity for possible liability. As a consequence, California courts have been consistently solicitous of insureds' expectations on this score. (See, e.g., *Horace Mann, supra,* 4 Cal.4th 1076; *CNA Casualty of California v.*

*Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 607 [222 Cal.Rptr. 276].)" (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295–296 [24 Cal.Rptr.2d 467, 24 861 P.2d 1153].)

### III

As it did in the trial court, Rombe argues the breakfast it hosted, and the later Internet report of the breakfast and Rombe's plans constituted the " 'use of another's advertising idea in your "advertisement" ' " within the meaning of the coverage provisions of AMCO's policy. Rombe contends that the breakfast was arguably a form of advertisement to "specific market segments." In attempting to establish the requisite advertising offense, Rombe relies on the fact that in its underlying lawsuit, TRC alleged misappropriation of its trade secrets and customer lists. Rombe argues that the alleged misappropriation of trade secrets and customer lists was broad enough to suggest the use of "another's advertising idea" at the breakfast and in the later Internet report.

For its part AMCO contends that the breakfast was not an advertisement and that the news report about the breakfast did not involve any arguable use of TRC's advertising ideas. We agree with AMCO on both counts. As we explain more fully below, the breakfast was not an advertisement within the meaning of AMCO's policy. With respect to the press report, the record on appeal does not include the report, but only a description of the report as set forth in TRC's underlying complaint. That description does not suggest any use of AMCO's advertising idea or any other advertising offense. Thus even if the press report were an advertisement, it did not involve any covered advertising offense.

### A. *"Advertising" Under Hameid*

The plaintiff in *Hameid* operated a beauty salon and had been sued by a competitor after he had recruited the competitor's employees and made direct solicitations to the competitor's customers. The Court of Appeal found that when viewed as a " 'start-up community beauty salon,' the relatively limited solicitation of customers through phone calls and . . . mailers served to call public attention to the salon'[s] beauty services." (*Hameid, supra*, 31 Cal.4th at p. 20.) Relying on cases which had reached a similar conclusion (see e.g. *New Hampshire Ins. Co. v. Foxfire Inc.* (N.D. Cal. 1993) 820 F.Supp. 489, 494 (*Foxfire*); *Sentex Systems, Inc. v. Hartford Acc. & Indem. Co.* (N.D. Cal. 1995) 882 F.Supp. 930, 939, affd. (9th Cir. 1996), 93 F.3d 578 (*Sentex*

*Systems*)), the Court of Appeal concluded that the solicitation was equivalent to the widespread promotional activities used in other industries and therefore constituted advertising under a CGL policy. (*Hameid, supra,* 31 Cal.4th at p. 21.) The Court of Appeal further found that in the context of a small business the misappropriation of advertising ideas included misappropriating confidential customer lists to identify and solicit clients. (*Ibid.*)

■ The Supreme Court reversed. It found that the plaintiff's solicitation of his competitor's employees and customers was not a covered form of advertising under the CGL policy. (*Hameid, supra,* 31 Cal.3d at p. 24.) In rejecting the Court of Appeal's analysis, the Supreme Court relied on its own prior statement in *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1276, footnote 9 [10 Cal.Rptr.2d 538, 833 P.2d 545], that " 'Most of the published decisions hold that "advertising" means widespread promotional activities directed to the public at large.' [Citation.]" (*Hameid, supra,* 31 Cal.4th at p. 23.) The court also noted that in *Bank of the West* it had "acknowledged that only a sparse minority of federal district court cases hold 'that the term "advertising" can also encompass personal solicitations.' [Citations.]" (*Hameid, supra,* 31 Cal.4th at p. 23.) In rejecting the notion that advertising includes personal solicitations, the court discussed a number of out-of-state authorities and agreed with what it found to be the majority approach to the issue. (*Id.* at p. 24.)

The court relied in particular on the holding in *Select Design Ltd. v. Union Mut. Fire Ins.* (1996) 165 Vt. 69 [674 A.2d 798] (*Select Design*). "In *Select Design* . . . the insured sought a defense after being sued for allegedly using proprietary information, including a customer list that a competitor's former employee provided, to solicit the competitor's customers. The insured's CGL insurance policy provided coverage for 'advertising injury.' (*Id.* at p. 799.) The Vermont Supreme Court stated that the 'majority view' defined 'advertising' as 'widespread distribution of promotional material to the public at large' partially because the majority 'read the policy provisions according to their plain, ordinary meaning.' (*Id.* at pp. 801–803.) The court reasoned that defining 'advertising' to include customer solicitations would stretch too far: 'If the act of contacting potential customers is advertising for the purposes of the policy, then any dispute related to economic competition among businesses is covered by the policy provision for advertising injury.' (*Id.* at p. 803.) Thus, the court held that solicitation of the competitor's customers did not constitute 'advertising' under the CGL insurance policy. (*Id.* at p. 802.)" (*Hameid, supra,* 31 Cal.4th at p. 24.)

The court also relied on *Monumental Life Ins. Co. v. U.S. Fidelity & Guaranty Co.* (1993) 94 Md.App. 505 [617 A.2d 1163]. The court in *Hameid* discussed *Monumental Life* in the following terms: "In

*Monumental Life* . . . the insured was accused of mailing recruiting letters to a competitor's employees and courting a competitor's customers with a personal solicitation that caused many of them to defect. When the insured sought a defense under the 'advertising injury' coverage of its CGL insurance policy, the trial court determined the insured's alleged activities were not 'advertising.' The Maryland Court of Special Appeals affirmed. It distinguished between 'advertising' and 'solicitation,' stating that '[t]he lower court clearly viewed advertising and solicitation as mutually exclusive, the difference being that advertising must be of a public nature.' (*Id.* at p. 1173.) The Court of Appeals agreed 'with the lower court that there is no *bona fide* ambiguity in the language of the policies at issue, nor is there any legitimate doubt as to its application under the circumstances. "Advertising" means *advertising*, i.e., "widespread distribution or announcements to the public." Consequently, Monumental's individual, one-to-one solicitations were clearly *not* "advertising" within the normal meaning of the word and, accordingly, the lower court acted properly.' (*Id.* at p. 1174.)" (*Hameid, supra*, 31 Cal.4th at p. 25.)

Finally, in *Hameid* the court rejected the notion that the term "advertising" was elastic and that its meaning could change with the context in which a particular insured did business. "As mentioned, *Foxfire,* [*supra*, 820 F.Supp. at p. 494] held that courts should determine whether activities are 'advertising' on a case-by-case basis, noting to whom the promotions are directed. (*Ibid.*) We disagree. Due to the pervasiveness of CGL insurance policies, and of advertising, if we adopted *Foxfire's* malleable definition, we likely would encourage litigation. Giving identical policy language different meanings for different insureds would eliminate the clarity and certainty that is essential to the insurance industry. Standardization of policy terms is important to insurers and insureds alike. It enables insurers to compare losses and calculate rates and premiums so that rates remain stable and not based on destabilizing ad hoc views of a particular coverage. It also gives effect to the parties' mutual intent as it existed at the time of contracting, so far as that intent is ascertainable and lawful. [Citation.]" (*Hameid, supra*, 31 Cal.4th at pp. 28–29.)[3]

### B. *"Specific Market Segments"*

As we have noted, the policy considered in *Hameid* did not contain the definition of "advertisement" which appears on the face of AMCO's policy. (See *Hameid, supra*, 31 Cal.4th at p. 24, fn. 3.) Here the trial court relied on that definition, including in particular the policy's reference to "specific

---

[3] We recognize that Rombe relies upon *Sentex Systems, supra,* 93 F.3d at pages 580–581. However, *Sentex Systems* preceded *Hameid* and its holding was implicitly rejected in *Hameid.* (See *Hameid, supra*, 31 Cal.4th at p. 21.)

market segments," in concluding that the policy potentially covered events such as the breakfast Rombe hosted. We disagree with the trial court's broad interpretation of AMCO's policy.

■ Under the policy's definition, "advertisements" are notices "published or broadcast" either to the general public or specific market segments. Any plain reading of the words "published" and "broadcast" include the notion of a relatively large and disparate audience.[4] As we interpret the AMCO policy, the reference to "specific market segments," is only a means of relieving an insured of the burden of showing that its advertising was directed to the general public, as opposed to some defined market, such as medical professionals, racing car enthusiasts, or horse breeders. The term "specific market segments" does not relieve an insured of the burden of demonstrating that it was engaged in relatively wide dissemination of its advertisements even if the distribution was focused on recipients with particular characteristics or interests.

We reject any broader interpretation of the AMCO policy for many of the reasons the court in *Hameid* discussed. An interpretation of the term "specific market segments" that is flexible enough to include guests at a meal hosted by an insured is flexible enough to include any kind of business communication. In the case of specialized fields of trade, such a broad interpretation of "specific market segments" could easily include the one-on-one solicitations which the court in *Hameid* found outside the scope of advertising. As the court in *Select Design* noted, such an expansion would provide coverage for almost all commercial disputes between competitors. We do not think the ISO, from which AMCO derived its definition of advertisements,[5] intended to provide such a radical alteration of the existing majority view of advertising coverage.

A malleable interpretation of "specific market segments" would also permit the very case-by-case, industry-by-industry interpretation which the court in *Hameid* rejected. As the court in *Hameid* noted, such a case-by-case approach encourages litigation and undermines the standardization which is needed by both insurers and insureds. (*Hameid, supra*, 31 Cal.App.4th at p. 29.)

---

[4] Webster's Third New International Dictionary (1981) at page 1837 provides the following definitions of "publish": "to call to the attention of the public: ADVERTISE," "to place before the public (as through a mass medium): DISSEMINATE." "Broadcast" is defined as follows: "1: cast or scattered in all directions <seed [broadcast] from the hand in sowing>: widely diffused 2: made public by means of radio or television (<the use of [broadcast] appeals to motorists to keep off the roads>)."

[5] See footnote 1, *ante*.

### C. *Rombe's Breakfast*

Neither the breakfast meeting Rombe hosted nor any solicitation which occurred there involved the broad dissemination of information which AMCO's policy required. As we have indicated, the record shows that the breakfast involved invited guests who learned about Rombe's future plans and were encouraged to use its services. This in-person form of promotion is not what is commonly thought of as advertising. (*Hameid, supra,* 31 Cal.4th at pp. 29–30.) Thus, the breakfast did not involve any activity covered by the terms of the AMCO policy.

### D. *The Internet Report*

TRC's complaint contained the following allegations: "38. Defendants further solicited both TRC customers and TRC temporary employees through the media. Rod Beals' meeting at the Handlery Hotel was reported in a Filipino Press [I]nternet newsletter of 'Local News.' A true and correct copy of this newsletter is attached hereto as Exhibit D.

"39. As reported by the Filipino Press, Defendants intend to operate TRC's business as their own by 'changing [TRC's] name, [and] dropping the franchise affiliation,' and further intend to divert all of TRC's temporary employees to Defendants' new venture, known as SmartStaff."

As we indicated, although the Filipino Press report was attached to TRC's complaint, it does not appear in the record on appeal in this case. Given its presumptively broad dissemination, the press report might have been an advertisement within the meaning of AMCO's policy. However, under the terms of AMCO's policy, in order to give rise to coverage, advertising by an insured must also involve some advertising offense. Here, nothing in the record suggests that the Internet account of the breakfast involved any such offense.

Under the policy, advertising offenses include slander or libel, violation of the right to privacy, copyright, title or slogan infringement, and the misappropriation of advertising ideas or style of doing business. Nothing on the face of TRC's complaint or anywhere else in the record shows that the press report involved any of these offenses. The report appears to have simply reported what occurred at the Rombe breakfast. Thus the press report would not by itself give rise to the possibility of any coverage under AMCO's policy.

## CONCLUSION

Nothing in the record supports any potential coverage under AMCO's policy. The breakfast Rombe hosted did not involve any advertising and the later report of the breakfast did not involve any advertising offense.

Judgment affirmed. Respondents to recover their costs of appeal.

O'Rourke, J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 20, 2005. George, C. J., and Baxter, J., did not participate therein.