SECOND DIVISION
DECEMBER 21, 2010

No. 1-09-1634

| | | |
|---|---|---|
| SANTA'S BEST CRAFT, L.L.C., a Delaware Limited Liability Company; SANTA'S BEST, an Illinois General Partnership; and H.S. CRAFT MANUFACTURING COMPANY, a Taiwanese Corporation, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 04 CH 01885 |
| ZURICH AMERICAN INSURANCE COMPANY, a New York Corporation, | ) ) ) | |
| Defendant and Third-Party Plaintiff-Appellee | ) ) | Honorable |
| (St. Paul Fire and Marine Insurance Company, | ) ) | Richard J. Siebel and Stuart Palmer, |
| Third-Party Defendant). | ) | Judges Presiding. |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham and Justice Karnezis concur in the judgment and opinion.

**OPINION**

This case arises out of an insurance coverage dispute. After being sued by a competitor for various forms of intellectual property infringement and deceptive trade practices, plaintiffs, Santa's Best Craft, L.L.C., Santa's Best, and H.S. Craft Manufacturing Company, tendered defense of the lawsuit to defendant Zurich American Insurance Company under two insurance policies issued by Zurich. Due to a conflict of interest, Zurich agreed to reimburse plaintiffs for expenses incurred by their independent legal counsel in defending the lawsuit. Nevertheless, plaintiffs filed the instant lawsuit, ultimately alleging that Zurich breached the insurance policies by

failing to provide a complete defense of the underlying lawsuit and failing to reimburse plaintiffs for the cost of settling the underlying lawsuit, and alleging that such conduct was vexatious and unreasonable. Through a series of partial summary judgment motions filed by the parties, the circuit court granted summary judgment in Zurich's favor on all issues.

Plaintiffs now appeal from the circuit court's orders, contending that: (1) Zurich's failure to immediately reimburse plaintiffs for defense expenses incurred was a breach of the duty to defend; (2) Zurich was obligated to reimburse plaintiffs for the amount of the settlement in the underlying lawsuit; (3) Zurich was obligated to reimburse plaintiffs for the cost of defending a third party pursuant to a license agreement; and (4) plaintiffs were entitled to prejudgment interest on defense expenses owed. For the following reasons, we affirm the judgment of the circuit court.

## I. BACKGROUND

Plaintiffs are manufacturers and wholesalers of seasonal products, specifically, Christmas lights. As a wholesaler, plaintiffs sell their Christmas lights directly to retailers, who then sell the lights to customers in a retail store. There are approximately 75 to 100 retailers to whom plaintiffs would potentially sell their products. Plaintiffs do not produce mailers, fliers, or internet ads to promote their products. Rather, plaintiffs and their competitors invite retailers to their respective showrooms approximately 18 months before the Christmas season in which their products would appear on the retailers' store shelves. The retailers make individual appointments to visit the showrooms. During these appointments, they view prototypes of the products that plaintiffs and their competitors intend to produce for the next Christmas season and the packages

in which they will be sold.  Occasionally, sales staff make presentations to each retailer about new products in the showrooms.  The retailers do not purchase any of the Christmas lights during these visits to the showroom but order products later as the next Christmas season approaches.

In the fall of 2001, plaintiffs produced a brand of Christmas lights called "Stay On," which would remain lit even if one of the bulbs on the strand burned out or was removed.  Plaintiffs developed "Stay On" lights in conjunction with General Electric Company.  Pursuant to that collaboration, plaintiffs entered into a license agreement with Monogram Licensing, Inc., under General Electric's authority, to use trademarks owned by General Electric on its "Stay On" packaging.  Section 12.01 of that license agreement provided that plaintiffs, as "Licensee,"

"shall defend, indemnify and hold harmless [Monogram] and [General Electric], and their *** representatives *** from and against any and all claims, liabilities, losses, costs, damages and expenses (including reasonable attorneys' fees) arising out of or in connection with (a) Licensee's acts or omissions in connection with this Agreement, the Licensed Marks and/or the Licensed Products including, but not limited to *** any infringement of any rights (including intellectual property) of anyone in connection with the manufacture, advertising, promotion, sale, possession or use of Licensed Products."

Section 12.03 further provided that plaintiffs "shall obtain and maintain at its own expense commercial general liability insurance including broad form coverage for *** advertiser's liability insurance, as set forth in Appendix I attached hereto."  Appendix I specifically required plaintiffs to "nam[e] [General Electric] and [Monogram] *** as additional insureds" on those insurance

3

policies and to provide Monogram with certificates of insurance listing them as additional insureds "as proof of such insurance." Plaintiffs' failure to provide the required insurance would be considered a material breach of the contract, but would not affect plaintiffs' obligations under section 12.01.

In late 2002, plaintiffs and Monogram were named as defendants in a lawsuit filed by JLJ, Inc., and Inliten, L.L.C., in the United States District Court for the Southern District of Ohio, which was subsequently amended (the underlying lawsuit). JLJ, Inc. v. Santa's Best Craft, L.L.C., No. C-3-02-00513 (S.D. Ohio). The underlying lawsuit alleged that JLJ and Inliten manufactured and sold Christmas lights under the name "Stay Lit," which competed with plaintiffs' "Stay On" lights. JLJ and Inliten alleged that plaintiffs copied their packaging and slogans and put them on the products and packages that plaintiffs displayed in their showroom. JLJ and Inliten alleged that plaintiffs traded on their name and good will, which resulted in lost profits. Consequently, JLJ and Inliten alleged eight state and federal causes of action: (1) trademark infringement; (2) false designation of origin and trade dress infringement; (3) false advertising; (4) trademark dilution; (5) deceptive trade practices; (6) piercing the veil of limited liability; (7) unjust enrichment; and (8) civil conspiracy. JLJ and Inliten sought injunctive relief as well as monetary damages.

Plaintiffs had acquired two insurance policies from Zurich for the period covering January 1, 2001 to January 1, 2002. The first policy, a commercial general liability (CGL) policy, provided coverage for, among other things, "Personal and Advertising Injury Liability" up to $1 million. The second policy was a "Custom Cover Policy" that provided, among other things, "Special

Liability Occurrence" coverage for advertising injuries (umbrella policy). Plaintiffs tendered defense of the underlying lawsuit to Zurich under the CGL policy. Initially, Zurich denied that it had a duty to defend plaintiffs because the alleged injuries occurred outside the policy period. After plaintiffs asked Zurich to reconsider its denial, Zurich agreed to provide plaintiffs with a defense subject to a full reservation of rights. In a May 3, 2003, letter to plaintiffs, Zurich additionally stated that "[b]ecause a conflict of interest exist[ed] between [plaintiffs] and Zurich," plaintiffs were permitted to select their own legal counsel and Zurich agreed to pay for those "reasonable and necessary attorneys' fees and other defense costs."

Zurich retained a law firm to review defense expense invoices submitted by plaintiffs to determine whether the charges were reasonable and whether they pertained to claims covered by the insurance policy. Upon receipt of each invoice, Zurich reimbursed plaintiffs for half of the amount of the invoice and agreed to reimburse the remaining amount, less any recommended adjustments, after its legal consultants completed their review. In total, plaintiffs submitted $1,322,063 in legal fees incurred through December 2003 on a rolling basis. Although Zurich's legal consultants determined that only $342,922 of those fees were reasonable or pertinent to claims covered by the insurance policy, Zurich had at that time reimbursed plaintiffs $650,061.

On February 2, 2004, plaintiffs filed the instant lawsuit against Zurich, seeking a declaration that Zurich had breached its duty to defend the underlying lawsuit by failing to "promptly and fully" reimburse them the entire amount of the expenses incurred. In their second amended complaint, plaintiffs dropped the declaratory judgment count and pursued relief based on

a breach of contract theory.  Specifically, plaintiffs alleged that Zurich breached the insurance

contract by

> "failing to fully, promptly and completely reimburse [plaintiffs'] defense expenses
>
> as they were incurred, failing to properly provide [plaintiffs'] defense in the
>
> [underlying] lawsuit, hindering and interfering in the defense of the [underlying]
>
> lawsuit, failing to settle the [underlying] lawsuit within policy limits, [and] failing
>
> to reimburse the reasonable cost of a reasonable settlement."

Plaintiffs also included a separate claim for relief from Zurich's allegedly unreasonable and

vexatious conduct pursuant to section 155 of the Illinois Insurance Code (Code) (215 ILCS 5/155

(West 2004)).

Shortly thereafter, Zurich filed a third-party complaint against St. Paul Fire and Marine

Insurance Company seeking a declaratory judgment as to St. Paul's obligations in the underlying

lawsuit and seeking contribution.  Zurich alleged that St. Paul had issued a CGL policy and an

umbrella policy to plaintiffs for the period covering January 1, 2002, to January 1, 2003.  Zurich

also alleged that the St. Paul policies provided coverage for the injuries alleged in the underlying

complaint.  Plaintiffs filed a separate declaratory judgment action against St. Paul in the United

States District Court for the Northern District of Illinois seeking a declaration of coverage for the

injuries alleged in the underlying lawsuit.  Santa's Best Craft, L.L.C. v. St. Paul Fire & Marine

Insurance Co., No. 04-C-1342 (N.D. Ill. 2004).

Plaintiffs then filed a "Motion for Partial Summary Judgment Quantifying Defense

Expenses" incurred by plaintiffs in the underlying lawsuit.  On the agreement of the parties, the

circuit court converted plaintiffs' motion into a petition for attorney fees. The court conducted a three-day evidentiary hearing to determine whether the fees sought by plaintiffs were reasonable and what portion of the fees were owed by Zurich. Zurich filed a motion *in limine* at the start of the fee petition hearing seeking to exclude any evidence or testimony regarding defense expenses paid by plaintiffs on behalf of Monogram pursuant to its license agreement because those fees were not recoverable under the insurance policies. The court insisted on evaluating the reasonableness of the Monogram defense expenses along with all other claimed expenses for purposes of the hearing, but agreed to convert Zurich's motion *in limine* into a motion for partial summary judgment on the issue of whether Zurich was obligated to pay Monogram's defense costs.[1]

The court ultimately determined that plaintiffs sought reimbursement of $4,076,397.29 in fees and costs incurred. However, after deducting certain ineligible expenses for which there was insufficient documentation or that were beyond the scope of coverage of the insurance policy, the court reduced the amount of recoverable fees and costs to $3,611,841 in "reasonable" expenses. The court further determined that Zurich had already reimbursed plaintiffs $790,016 and St. Paul had reimbursed plaintiffs $1,285,690.80, leaving a balance of $1,536,134.20 in fees owed to plaintiffs. It entered judgment against Zurich in that amount. However, the court noted that the Monogram defense expenses represented $1,265,116.30 of that balance. Thus, the court stayed

---

[1] Although St. Paul was in the unusual position of being a third party in this litigation, but unable to assert policy defenses because of the parallel litigation proceeding on its defense duties in federal court, St. Paul agreed to be bound by the circuit court's determination of the amount of fees owed.

enforcement of the judgment against Zurich with respect to the Monogram defense expenses pending the outcome of Zurich's motion for partial summary judgment on the issue, but ordered Zurich to pay the remaining $271,017.90 without delay. The court further denied plaintiffs' request for prejudgment interest on the amount owed, stating that the invoices were not "liquidated amounts on which prejudgment interests [*sic*] would accrue."

With respect to the Monogram defense expenses, the court later determined that Zurich had no duty to defend Monogram under the CGL policy and, therefore, no duty to reimburse plaintiffs for the cost of Monogram's defense. Plaintiffs had argued that the CGL policy provided coverage for contract indemnitees that plaintiffs were obligated to defend *vis-a-vis* an "insured contract." Thus, they argued, the license agreement gave rise to plaintiffs' obligation to defend Monogram, and in turn, Zurich was obligated to pay Monogram's defense costs. However, the court ruled that the CGL policy specifically excluded coverage for personal and advertising injuries "for which the insured has assumed liability in a contract or agreement." Additionally, the court recognized that there was an exception to the exclusion if plaintiffs had an independent legal obligation to indemnify Monogram based on the parties' relationship absent the license agreement. However, the court determined that in this case, absent the license agreement, based on the parties' relationship, Monogram would have an obligation to indemnify plaintiffs. Thus, the exception did not apply.

The court also determined that, unlike the CGL policy, the language of the umbrella policy did not provide a duty to defend a contract indemnitee. It then determined that Zurich had no duty to indemnify plaintiffs for Monogram's defense expenses under the umbrella policy. The court

8

determined that although the umbrella policy provided coverage for "sums [plaintiffs] become[ ] legally obligated to pay *** under an insured contract," the actual injury alleged in the underlying lawsuit was not an "advertising injury" covered by the policy. The court construed the policy to require that an "advertising injury" must arise out of an "advertisement," and that displaying the offending products and packaging in plaintiffs' showroom was not an "advertisement."

After settling the underlying lawsuit for $3.5 million, plaintiffs filed a "Motion for Partial Summary Judgment On Zurich's Settlement Reimbursement Obligations." As part of their motion, plaintiffs again argued that Zurich was estopped from raising any coverage defenses with respect to its duty to reimburse plaintiffs for the amount of the settlement because Zurich breached its duty to defend by failing to promptly and fully reimburse defense costs. The court did not rule on the specific question of whether Zurich breached its duty to defend. Rather, it concluded that "[e]ven if Zurich [had] breached its duty to defend, the estoppel doctrine applies only to policy defenses (*e.g.* late notice)," and, therefore, Zurich was not estopped from raising coverage defenses.

Zurich then filed a motion for partial summary judgment on the issue of whether it was obligated to indemnify plaintiffs for the cost of the settlement. Zurich again argued, and the court again found, that plaintiffs' display of the allegedly infringing "Stay On" lights and packaging in the showroom was not an "advertisement" under either the CGL policy or the umbrella policy and was not an "advertising injury" as defined by the policies. Therefore, the alleged injuries did not fall within the scope of coverage and Zurich had no obligation to indemnify plaintiffs for the cost of the settlement.

9

Because the circuit court determined that Zurich had no obligation to indemnify plaintiffs for the settlement or Monogram's defense fees, it dismissed the third-party complaint against St. Paul. Additionally, because Zurich did not act unreasonably in reimbursing plaintiffs' defense expenses, there was no basis on which to pursue the vexatious conduct claim. After all issues were finally disposed of in the circuit court, plaintiffs filed this appeal.

## II. ANALYSIS

Plaintiffs appeal from several orders of the circuit court granting summary judgment in favor of Zurich. We review *de novo* the circuit court's orders granting summary judgment. *Salerno v. Innovative Surveillance Technology, Inc.*, 402 Ill. App. 3d 490, 496 (2010). Ultimately, we must determine whether the circuit court reached the proper result. *Salerno*, 402 Ill. App. 3d at 496. Therefore, we need not defer to the circuit court's reasoning and may instead affirm the judgment on any basis supported by the record. *Salerno*, 402 Ill. App. 3d at 496.

### A. Zurich's Duty to Defend Plaintiffs

In their first argument on appeal, plaintiffs claim that Zurich's failure to pay all of their defense expenses in full immediately upon receipt was a breach of the duty to defend and, therefore, Zurich was estopped from raising any coverage defenses. They cite to selected language from *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127 (1999), and *Murphy v. Urso*, 88 Ill. 2d 444 (1981), in support of their claim.

It is well settled that when an insured tenders defense of a claim to its insurer, and the insurer believes the claim is not covered by the insurance policy, the insurer cannot "simply refuse to defend the insured." *Ehlco*, 186 Ill. 2d at 150. Rather, it must either: (1) defend the underlying

suit under a reservation of rights; or (2) seek a declaratory judgment that no coverage exists under the terms of the policy. *Ehlco*, 186 Ill. 2d at 150. Where the insurer fails to take either of those two actions and is later found to have wrongfully denied coverage, it has breached its duty to defend. *Ehlco*, 186 Ill. 2d at 150-51. As a consequence of that breach, the insurer is estopped from later asserting any policy defenses to coverage, even if those defenses may have been successful in the absence of the breach. *Ehlco*, 186 Ill. 2d at 151-52. It is an extraordinary remedy, but warranted in light of the fact that the insurer's duty to defend is "so fundamental an obligation that a breach of that duty constitutes a repudiation of the contract." *Ehlco*, 186 Ill. 2d at 151.

However, where there is a conflict of interest between the insurer and the insured, and the insurer cannot fully represent the interests of the insured, the insurer may not undertake the defense of the insured itself. *Ehlco*, 186 Ill. 2d at 156. Nevertheless, the insurer remains bound under the insurance policy to provide the insured with a defense and, therefore, must permit the insured to be represented by counsel of its own choosing. *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 198 (1976); *Ehlco*, 186 Ill. 2d at 156. Under those circumstances, the insurer then "must reimburse [the insured] for the reasonable cost of defending the action." *Peppers*, 64 Ill. 2d at 199.

There is no dispute in this case that Zurich agreed to defend plaintiffs in the underlying action under a reservation of rights and that because of a conflict of interest, it agreed to reimburse plaintiffs for "reasonable and necessary attorneys' fees and other defense costs." Rather, plaintiffs object to the manner in which Zurich reimbursed their defense expenses. Although plaintiffs

11

recognize that they are only entitled to reimbursement for "necessary and reasonable" defense fees, they argue that "whatever the insured does to defend itself is treated as necessary and reasonable." Thus, they argue, Zurich's review of the reasonableness of the expenses submitted by plaintiffs for reimbursement amounts to "second-guessing what is 'necessary and reasonable' for the defense" of the underlying action and constitutes a breach of the duty to defend.

In essence, plaintiffs are asking this court to determine that the defense expenses submitted on behalf of an insured's independent legal counsel are *per se* reasonable. We decline to do so, especially in light of the circuit court's determination that certain defense expenses submitted by plaintiffs were unreasonable. After plaintiffs raised this issue in the circuit court in a summary judgment motion, the court converted their motion into a petition for attorney fees and conducted a line-by-line review of the defense expenses. The court held a three-day hearing, considered several witnesses' testimony, and examined volumes of documents submitted by both parties as to the reasonableness of the fees. Although the court determined that Zurich underpaid plaintiffs by approximately $271,000, it also determined that plaintiffs overbilled Zurich by nearly $465,000, a finding that plaintiffs do not contest on appeal. Thus, Zurich had no obligation to reimburse plaintiffs for those defense expenses that the court found to be unjustified and, therefore, unreasonable. See *Peppers*, 64 Ill. 2d at 199. That a portion of plaintiffs' own defense expenses was deemed unreasonable necessarily undermines any argument they could make in support of a general rule that an insured's defense expenses are reasonable as a matter of law.

Nor does plaintiffs' position find support in *Ehlco* or *Murphy*. Although the court in *Ehlco* concluded that the insurer, Wausau, was estopped from asserting policy defenses because it

12

"fail[ed] to reimburse [the insured] for the costs of its defense as incurred," the court was not commenting on the amount of time between the insured's submission of expenses to Wausau and its subsequent receipt of reimbursement. *Ehlco*, 186 Ill. 2d at 156. Rather, Wausau "simply refuse[d] to defend the insured." *Ehlco*, 186 Ill. 2d at 150. Wausau did not believe there was coverage under the policy, but, contrary to long-standing law, did not defend under a reservation of rights and did not file a declaratory judgment action until after the underlying lawsuit had been settled. *Ehlco*, 186 Ill. 2d at 154. In fact, it "did nothing other than request information" from the insured for more than six months, when the insured notified Wausau of a settlement offer. *Ehlco*, 186 Ill. 2d at 134. In response, Wausau, which had still not agreed to defend the insured, offered to "participate" in the underlying action by paying a mere 9% of the settlement and defense amounts, which the insured refused. *Ehlco*, 186 Ill. 2d at 134. Thus, in the declaratory judgment action, Wausau was found to have breached its duty to defend and was estopped from asserting policy defenses. *Ehlco*, 186 Ill. 2d at 154-55. On appeal, Wausau asserted a *post hoc* argument that its breach should be excused because it had a conflict of interest with the insured. *Ehlco*, 186 Ill. 2d at 156-57. The court noted that "even in the unlikely event" that there was a conflict of interest, estoppel applied because Wausau abandoned its obligations under the insurance policy by doing and paying nothing on behalf of its insured. *Ehlco*, 186 Ill. 2d at 154.

On the contrary, Zurich satisfied its duty to defend plaintiffs, despite its belief that the insurance policy did not provide coverage for the claim asserted. It agreed to defend plaintiffs under a reservation of rights, agreed to permit plaintiffs to choose their own legal counsel to defend them in the underlying action, and agreed to reimburse plaintiffs for reasonable defense

expenses. Moreover, Zurich immediately paid half the amount of the invoice submitted while it reviewed the reasonableness of the charges. Zurich did not withhold payment as a way of undermining the defense strategy, as plaintiffs suggest. Rather, Zurich objected to charges for which there was insufficient documentation and to charges that went beyond the scope of coverage for the underlying lawsuit, as the circuit court ultimately found.

Plaintiffs similarly overreach in their reading of *Murphy*. The court's comment on an insurer's obligation to underwrite the cost of "whatever defense [the insured] chose to make" was made in the context of resolving the ethical problems that arise when the insurer and the insured have competing interests, rather than a comment on the inherent propriety of those defense expenses. See *Murphy*, 88 Ill. 2d at 454.

### B. Zurich's Duty to "Reimburse" the Settlement Amount

Plaintiffs next argue that they are entitled to "reimbursement" for the amount of the settlement paid in the underlying case. Although plaintiffs frame their argument in terms of Zurich's breach of its duty to settle, that obligation is not implicated here. See *Haddick v. Valor Insurance*, 198 Ill. 2d 409, 414-15 (2001) (an insurer's duty to settle derives from its "exclusive control over settlement negotiations and defense of litigation"); *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 525 (1996) (the "duty to settle" arises only when the insured has relinquished defense of the underlying suit to the insurer). Rather, any obligation to repay plaintiffs for the cost of the settlement arises out of Zurich's duty to indemnify.

Once the insured has accrued liability in the underlying lawsuit, the duty to indemnify is implicated. *Certain Underwriters at Lloyd's, London v. Boeing Co.*, 385 Ill. App. 3d 23, 41

(2008), citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 127 (1992). Where, as here, the insured settles the underlying lawsuit prior to verdict, it must demonstrate that it settled "an otherwise covered loss in 'reasonable anticipation of personal liability' " to recover the settlement. *Federal Insurance Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277, 282 (2009), quoting *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 625 (1994). That is, an insured is only entitled to indemnity for losses that actually fall within the terms of the insurance policy. *Binney & Smith*, 393 Ill. App. 3d at 290; *cf. Lorenzo v. Capitol Indemnity Corp.*, 401 Ill. App. 3d 616, 619 (2010) (the duty to defend arises if the alleged losses potentially fall within the terms of the policy).

To determine whether the claimed loss was in fact covered by the policy, we must compare the allegations in the underlying lawsuit to the language of the policy itself. *Binney & Smith*, 393 Ill. App. 3d at 290. In construing the policy language, our primary objective is "to ascertain and give effect to the intentions of the parties as expressed by the words of the policy." *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). We construe the policy as a whole, giving effect to every provision. *Central Illinois Light*, 213 Ill. 2d at 153. Where the words used in the policy are clear and unambiguous, we afford them their plain, ordinary, and popular meaning. *Central Illinois Light*, 213 Ill. 2d at 153.

Plaintiffs claim that the CGL policy and the umbrella policy each provide coverage for the infringement and deceptive trade practice claims alleged in the underlying lawsuit. We will examine the language of each policy in turn.

15

Plaintiffs rely on the following language in the CGL policy in support of their claim for coverage:

"COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies.

\*\*\*

SECTION V - DEFINITIONS

1. 'Advertisement' means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers and supporters.

\*\*\*

14. 'Personal and advertising injury' means injury, including consequential 'bodily injury', arising out of one or more of the following offenses:

\*\*\*

f. The use of another's advertising idea in your 'advertisement'; or

g. Infringing upon another's copyright, trade dress or slogan in your 'advertisement'."

16

Under this policy, Zurich must pay damages on plaintiffs' behalf resulting from an "advertising injury" caused by plaintiffs. The relevant portions of the policy define an "advertising injury" as infringing upon another's advertising idea, copyright, trade dress, or slogan in plaintiffs' "advertisement."

The dispute in this case involves whether the alleged injuries caused by plaintiffs arose out of an "advertisement." Plaintiffs acknowledge that they did not advertise to the general public when they invited 75 to 100 retailers to their showroom to view their prototype "Stay On" products and packaging. Rather, they argue that their displays were directed at retailers, which are a "specific market segment" of the general public under the policy's definition of "advertisement." However, they provide us with no legal or other authority to support that claim. Nevertheless, we need not reach that question.

Our research reveals that no Illinois cases have yet determined what constitutes an "advertisement" as defined by the specific language in this CGL policy. In fact, few courts nationwide have had occasion to interpret this policy term. Therefore, we analyze it as a matter of first impression.

The CGL policy defines an "advertisement" as "a notice that is broadcast or published to the general public or specific market segments" about the insured's goods or services. In addition to establishing to whom the notice was directed, an insured must also establish that the notice was "broadcast or published." The policy does not define "broadcast" or "published"; therefore, we look to the dictionary to ascertain the words' plain, ordinary, and popular meanings. *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 366 (2006). The term

"broadcast" means "to make widely known: disseminate or distribute widely or at random." Websters Third New International Dictionary 280 (1981). To "publish" means "to declare publicly: make generally known: disclose, circulate." Websters Third New International Dictionary 1837 (1981). Thus, under the terms of the CGL policy, an "advertisement" must be widely disseminated to its intended audience, regardless of whether the audience is the general public or a specific market segment thereof. This comports with our interpretation of "advertising" in general, which contemplates the " 'widespread distribution of promotional material to the public at large.' " *Lexmark International, Inc. v. Transportation Insurance Co.*, 327 Ill. App. 3d 128, 138 (2001), quoting *International Insurance Co. v. Florists' Mutual Insurance Co.*, 201 Ill. App. 3d 428, 433 (1990); see also *Playboy Enterprises, Inc. v. St. Paul Fire & Marine Insurance Co.*, 769 F.2d 425, 429 (7th Cir. 1985) (applying Illinois law). Nevertheless, directing the notice to a "specific market segment" of the general public, as the CGL policy permits in this case, does not obviate the requirement that it must be widely disseminated. Thus, regardless of whether retailers are a "specific market segment" of the general public, as plaintiffs argue, plaintiffs still must demonstrate that their "advertisement" was "broadcast or published" to their audience.

We find support for this interpretation in the case law of the few other jurisdictions that have interpreted this specific policy language. Specifically, in *Rombe Corp. v. Allied Insurance Co.*, which involved notably similar facts, an insured argued that an assembled group of a competitor's customers was a "specific market segment" to whom its "advertisement" was directed. *Rombe Corp. v. Allied Insurance Co.*, 27 Cal. Rptr. 3d 99, 106 (Cal. Ct. App. 2005).

18

Relying on the plain language of the policy, the *Rombe* court concluded that regardless of whether the group was a "specific market segment," the policy language required that any "advertisement" must have been "published or broadcast," meaning that it was directed at a "relatively large and disparate audience." *Rombe*, 27 Cal. Rptr. 3d at 106. Thus, the insured was not relieved of "the burden of demonstrating that it was engaged in relatively wide dissemination of its advertisements even if the distribution was focused on recipients with particular characteristics or interests." *Rombe*, 27 Cal. Rptr. 3d at 106. In the absence of any wide dissemination of the "advertisement," the insured's conduct was merely "solicitation of business," which could not be considered advertising under the language of the policy. *Rombe*, 27 Cal. Rptr. 3d at 101, 107. See also *Continental Casualty Co. v. Consolidated Graphics, Inc.*, 656 F. Supp. 2d 650, 661 (S.D. Tex. 2009) (concluding that "[t]he linchpin of what constitutes *** 'advertising' under a [CGL] policy is that the alleged conduct must be widely disseminated").

Furthermore, we find the *Rombe* court's underlying policy rationale for this interpretation persuasive. The holding in *Rombe* was an extension of the California Supreme Court's earlier decision in *Hameid v. National Fire Insurance of Hartford*, 71 P.3d 761 (Cal. 2003), in which that court adopted the approach of the majority of courts, including Illinois, in defining "advertising" as "widespread promotional activities usually directed to the public at large." *Hameid*, 71 P.3d 766, 767, citing *Florists' Mutual*, 201 Ill. App. 3d at 433. The *Hameid* court arrived at its conclusion after an exhaustive analysis of the definition of "advertising," comparing the interpretation of the term among courts nationwide. See, *e.g.*, *Select Design, Ltd. v. Union Mutual Fire Insurance Co.*, 674 A.2d 798 (Vt. 1996); *Monumental Life Insurance Co. v. United States*

*Fidelity & Guaranty Co.*, 617 A.2d 1163 (Md. Ct. Spec. App. 1993); *Solers, Inc. v. Hartford Casualty Insurance Co.*, 146 F. Supp. 2d 785 (E.D. Va. 2001); *Smartfoods, Inc. v. Northbrook Property & Casualty Co.*, 618 N.E.2d 1365 (Mass. App. Ct. 1993); *American States Insurance Co. v. Vortherms*, 5 S.W.3d 538 (Mo. Ct. App. 1999); and *MGM, Inc. v. Liberty Mutual Insurance Co.*, 839 P.2d 537 (Kan. Ct. App. 1992); but see *New Hampshire Insurance Co. v. Foxfire, Inc.*, 820 F. Supp. 489 (N.D. Cal. 1993); *Sentex Systems, Inc. v. Hartford Accident & Indemnity Co.*, 882 F. Supp. 930 (N.D. Cal. 1995).

*Hameid* rejected the minority approach set forth in *Foxfire* and *Sentex*, among others, which defined "advertising" on a case-by-case basis, taking into consideration to whom the promotions were directed. *Hameid*, 71 P.3d at 769. The *Hameid* court reasoned that in light of the pervasiveness of standard form CGL policies, adopting such a "malleable" definition of advertising would "eliminate the clarity and certainty" that insureds and insurers rely on in policy interpretation and thereby encourage needless litigation. *Hameid*, 71 P.3d at 769. Moreover, introducing such uncertainty into the interpretation of insurance policy terms disrupts insurers' ability to "compare losses and calculate rates and premiums so that rates remain stable," to the detriment of both parties. *Hameid*, 71 P.3d at 769. Therefore, like *Rombe* and *Hameid*, we conclude that the audience to whom an "advertisement" is directed is secondary to the fact that an "advertisement" must be "broadcast or published." See also *Consolidated Graphics*, 656 F. Supp. 2d at 661.

In this case, plaintiffs have not established that their notice was "broadcast or published" and, therefore, cannot satisfy the policy's definition of "advertisement." Rather, their conduct

was akin to personal solicitation, which is not advertising. Again, we look to the similarities between this case and *Rombe*. In *Rombe*, a representative for the insured invited a group of customers to a meeting and recruited them to become customers of his newly formed company. *Rombe*, 27 Ca. Rptr. 3d at 101. Like plaintiffs in this case, the insured argued that its meeting was an "advertisement" under the same definition at issue here because the assembled group constituted a "specific market segment." *Rombe*, 27 Cal. Rptr. 3d at 104. However, the court found that neither the meeting itself nor the invitation to do business with the new company constituted an "advertisement" because there was no broad dissemination of information, regardless of whether the group could be considered a "specific market segment." *Rombe*, 27 Cal. Rptr. 3d at 107. Rather, inviting an assembled group of guests to become customers was an "in-person form of promotion [that] is not what is commonly thought of as advertising." *Rombe*, 27 Cal. Rptr. 3d at 107.

Similarly, in this case, plaintiffs invited each of their 75 to 100 potential customers to their showroom to view their products. The retailers made individual appointments to view the products and received personal presentations about the products displayed. Additionally, as plaintiffs admit, they did not send out any mailers or fliers or conduct any Internet-based advertising to attract potential customers. As in *Rombe*, we do not regard plaintiffs' "in-person form of promotion" as a broadcast or publication of the type required of an "advertisement" under the terms of the CGL policy. See *Rombe*, 27 Cal. Rptr. 3d at 107; *Consolidated Graphics*, 656 F. Supp. 2d at 661-62 (holding that direct contact with specific, prior customers was a solicitation, not an advertisement); see also *First Bank & Trust Co. v. New Hampshire Insurance Group*, 469

A.2d 1367, 1368 (N.H. 1983) (holding that the " 'mere explanation' " of a bank's services to potential customers in a private meeting is not advertising). Accordingly, the claims in the underlying lawsuit were not covered under the CGL policy.

We also find that there is no coverage under the umbrella policy. Section B-1 of the umbrella policy provides coverage for "sums [plaintiffs] become legally obligated to pay" so long as the "injury or damage [is] caused by an 'occurrence' which results in 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury.' " The relevant definitions of "advertising injury" include:

> "Injury arising out of one or more of the following offenses:
>
> ***
>
> 3. Misappropriation of advertising ideas or styles of doing business.
>
> 4. Infringement of copyright, title or slogan."

Plaintiffs claim that there is no requirement that an "advertising injury" arise out of an "advertisement" in order to be covered under the umbrella policy as there was with the CGL policy. Therefore, they argue, construing the policy strictly against Zurich, we cannot deny that coverage exists under the umbrella policy. We disagree.

Again, we are obligated to give the language of the policy its plain, ordinary, and popular meaning to determine the parties' intent, and where the language is unambiguous, we apply it as written. *Central Illinois Light*, 213 Ill. 2d at 153. We will only construe the language of an insurance policy against the insurer where the words are ambiguous. *Valley Forge*, 223 Ill. 2d at 363. However, a policy's language will not be deemed ambiguous "simply [because] the parties

can suggest creative possibilities for their meaning." *Valley Forge*, 223 Ill. 2d at 363. Rather, words are ambiguous only if they are reasonably susceptible to more than one interpretation. *Valley Forge*, 223 Ill. 2d at 363. We will not search for ambiguity where there is none. *Valley Forge*, 223 Ill. 2d at 363.

There is no ambiguity here: the plain, ordinary meaning of an advertising injury requires that the injury result from an advertisement. In fact, to establish that an advertising injury occurred, an insured must demonstrate as a threshold matter that it was engaged in "advertising activity," which encompasses more than the mere publication of an advertisement. See *Lexmark*, 327 Ill. App. 3d at 137-38; see also Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes §7.04(b) (10th ed. 2000). The advertisement is inherent in the nature of the injury; we cannot separate those concepts. Indeed, it is difficult to conceive of any context in which an advertising injury would not occur as a result of an advertisement or other advertising activity. Therefore, plaintiffs' interpretation of the policy is unreasonable and does not introduce any ambiguity that we must resolve against Zurich. *Valley Forge*, 223 Ill. 2d at 363.

As stated above, absent any specific policy provision to the contrary, an insured must establish that it was engaged in advertising activity that contemplates the " 'widespread distribution of promotional material to the public at large.' " *Lexmark*, 327 Ill. App. 3d at 137-38, quoting *Florists' Mutual*, 201 Ill. App. 3d at 433. Plaintiffs have admitted that their showroom displays were not advertisements to the general public. Rather, they have maintained that they advertised to retailers, a "specific market segment" of the general public, for purposes of complying with the language of the CGL policy. However, advertising activity under the umbrella

23

policy is not limited in the same manner and does not allow for an insured's broadcast or publication of promotional materials to "market segments." Therefore, they did not engage in advertising activity and there was no "advertising injury" under the umbrella policy. Accordingly, Zurich also has no obligation to indemnify plaintiffs under the umbrella policy.

C. Zurich's Duty to "Reimburse" Monogram's Defense Expenses

Plaintiffs next argue that both the CGL policy and the umbrella policy entitle them to "reimbursement" for defense expenses they paid on behalf of Monogram; however, they again fail to provide us with a legal framework under which to analyze the issue. Thus, the imprecision of their argument requires us to first determine whether we should analyze this issue under Zurich's duty to defend Monogram or its duty to indemnify plaintiffs for the defense expenses paid on Monogram's behalf.

Plaintiffs complaint in the court below did not assert a specific theory under which they sought recovery of Monogram's defense expenses. In fact, the prayer for relief makes no mention at all of the defense expenses paid on Monogram's behalf. However, in plaintiffs' brief on appeal, they argue that Monogram was a "licensor whom [plaintiffs] agreed to defend and indemnify" pursuant to their license agreement, that they did pay Monogram's defense expenses, and that they were entitled to "reimbursement" for those expenses. However, they also cite to a provision in the Supplementary Payments section of the CGL policy that obligates Zurich to "defend" Monogram in the underlying lawsuit as plaintiffs' indemnitee.

We conclude that this issue must be analyzed as Zurich's duty, if any, to indemnify plaintiffs for defense expenses paid on Monogram's behalf. Our supreme court defines "indemnification" as

> " '[r]eimbursement or compensation for loss, damage, or liability in tort; esp[ecially], the right of a party who is secondarily liable to recover from the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty.' " *Virginia Surety Co. v. Northern Insurance Co. of New York*, 224 Ill. 2d 550, 566 (2007), quoting Black's Law Dictionary 784 (8th ed. 2004).

Here, plaintiffs are seeking to recover amounts paid that arose out of the liability they assumed in the license agreement, which comports with the concept of indemnification cited above. See also *Boeing*, 385 Ill. App. 3d at 41. Moreover, even if Zurich initially had a duty to defend Monogram in the underlying lawsuit, once plaintiffs paid the costs, the issue became one of indemnification under the supreme court's definition. That is, plaintiffs would have been a "party secondarily liable" to Monogram seeking to recover from Zurich, the party "primarily liable" to Monogram, expenditures plaintiffs paid to Monogram's attorneys for defense costs. Thus, this issue involves Zurich's duty to indemnify.

As explained above, Zurich's duty to indemnify plaintiffs arises only if the injuries alleged in the underlying lawsuit were actually covered under the policy. See *Binney & Smith*, 393 Ill. App. 3d at 290. We have already determined that the CGL policy does not provide coverage for the injuries alleged in the underlying complaint because they were not "advertising injuries."

25

Therefore, Zurich has no duty to indemnify plaintiffs for Monogram's defense expenses under that policy.

Turning to the umbrella policy, plaintiffs rely on paragraph A of the Special Liability Coverage section to support their claim for "reimbursement." It provides that Zurich will pay "those sums [plaintiffs] become[ ] legally obligated to pay or assume[ ] under an 'insured contract' ***. The injury or damage must be caused by an 'occurrence' which results in *** 'advertising injury' ***." Once again, as we have determined, the allegations of the underlying complaint do not constitute "advertising injuries" because they did not arise out of advertising activity. Therefore, Zurich also has no duty to indemnify plaintiffs for amounts paid on Monogram's behalf in defense of those alleged injuries.

### D.  Plaintiffs' Entitlement to Prejudgment Interest

Finally, plaintiffs allege that pursuant to section 2 of the Illinois Interest Act (815 ILCS 205/2 (West 2004)), they are entitled to prejudgment interest on the amount of the defense expenses Zurich was ordered to pay following the fee petition hearing. The decision to award prejudgment interest is a matter within the sound discretion of the circuit court and will not be reversed absent an abuse of discretion. *Marcheschi v. Illinois Farmers Insurance Co.*, 298 Ill. App. 3d 306, 313 (1998). In order to recover prejudgment interest, the amount due must be liquidated or subject to an easy determination. *Marcheschi*, 298 Ill. App. 3d at 314, citing *Couch v. State Farm Insurance Co.*, 279 Ill. App. 3d 1050, 1054 (1996).

In *Couch*, the circuit court denied prejudgment interest on the award because the amount due was not easily determined. *Couch*, 279 Ill. App. 3d at 1055. The plaintiff in that case sought

over $270,000 in claimed damages, but was awarded only $35,000. The *Couch* court concluded that "[t]his fact alone serves as a strong indication that the amount of damages was not readily ascertainable." *Couch*, 279 Ill. App. 3d at 1055.

In this case, after a three-day evidentiary hearing in which plaintiffs sought to recover approximately $2 million in outstanding defense expenses they claimed they were owed, the court awarded them $271,017.90. The vast disparity in the amount sought and the amount awarded, together with the lengthy evidentiary hearing required to calculate the amount of the fees due, similarly support the conclusion that the damages were not easily determined, nor were they liquidated. See *Couch*, 279 Ill. App. 3d at 1055. Therefore, the court did not err in denying plaintiffs' motion for prejudgment interest.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

_____

SANTA'S BEST CRAFT, L.L.C., a Delaware Limited Liability Company;
SANTA'S BEST, an Illinois General Partnership; and
H.S. CRAFT MANUFACTURING COMPANY, a Taiwanese Corporation,

     Plaintiffs-Appellants,

     v.

ZURICH AMERICAN INSURANCE COMPANY, a New York Corporation

     Defendant and Third-Party Plaintiff-Appellee

(St. Paul Fire and Marine Insurance Company,

     Third-Party Defendant).
_____

**No. 1-09-1634**

**Appellate Court of Illinois**
**First District, Second Division**

**Filed: December 21, 2010**
_____

**JUSTICE CONNORS delivered the opinion of the court.**

**Cunningham, P.J., and Karnezis, J., concur.**
_____

**Appeal from the Circuit Court of Cook County**
**Honorable Richard J. Siebel and Stuart Palmer, Judges Presiding**
_____

| For PLAINTIFFS-APPELLANTS | Gary I. Blackman<br>Mitchell Bryan<br>Levenfeld Pearlstein<br>2 N. LaSalle St., Suite 1300<br>Chicago, Illinois 60602 | David A. Gauntlett<br>James A. Lowe<br>Gauntlett & Associates<br>18400 Von Karman, Suite 300<br>Irvine, California 92612 |
|---|---|---|
| For DEFENDANT-APPELLEE: | Jeffrey A. Goldwater<br>Perry M. Shorris<br>Lewis, Brisbois, Bisgaard & Smith, LLP<br>550 W. Adams St., Suite 300<br>Chicago, Illinois 60661 | |